Marvin Edwin **JOHNSON,**
**Petitioner–Appellant,**

v.

Richard L. **DUGGER, Secretary, Florida**
**Department of Corrections,**
**Respondent–Appellee.**

No. 89–3195.

United States Court of Appeals,
Eleventh Circuit.

Aug. 21, 1990.

442

Billy H. Nolas, Larry H. Spalding, Office of Capital Collateral Representative, Tallahassee, Fla., for petitioner-appellant.

Mark Menser, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for respondent-appellee.

Before KRAVITCH and ANDERSON, Circuit Judges, and HILL, Senior Circuit Judge.

ANDERSON, Circuit Judge:

This appeal marks the second time that Marvin Edward Johnson, a convict on Florida's death row, has appeared before this court challenging his capital murder conviction and death sentence. In his first appeal, we found no constitutional error in the state court proceedings leading to his death sentence and affirmed the district court's denial of his petition for a writ of habeas corpus. *Johnson v. Wainwright* ("*Johnson I*"), 806 F.2d 1479 (11th Cir. 1986), *cert. denied,* 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 157 (1987). In this appeal, he raises five claims: (1) that his sentencing hearing violated the Supreme Court's admonitions in *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), because the trial judge, in overriding the sentencing jury's recommendation of life imprisonment, failed to consider nonstatutory mitigating evidence; (2) that

his appellate counsel was ineffective in not challenging on direct appeal the denial of his motion to suppress an allegedly unreliable and suggestive photographic identification procedure; (3) that the Florida courts, by allowing the trial judge to override the jury's life imprisonment recommendation in this case, have applied their reviewing standard in such a manner as to result in an arbitrary and capricious imposition of the death sentence; (4) that his trial counsel rendered ineffective assistance both by not ensuring that a proper mental health examination was conducted prior to his sentencing hearing and by failing to conduct any additional investigation during the time period between the hearing before the sentencing jury and the final hearing before the trial judge; and finally (5) that his trial counsel, by wholly failing to prepare a rebuttal to the state's ballistic and crime-scene reconstruction evidence, was ineffective.

The district court, reviewing these claims without a hearing, denied Johnson's petition for habeas relief. Although we agree with the district court's resolution of most of the claims, we hold that a remand is necessary with respect to Johnson's claim of ineffective assistance of counsel at sentencing.

I. PROCEDURAL BACKGROUND

In order to fully understand this court's discussion of the various issues, particularly as they relate to the resolution of whether certain claims have been procedurally defaulted or constitute abuse of the writ, some detail of the procedural history of this case is necessary. On December 8, 1978, Johnson was convicted by a jury of first-degree murder and armed robbery.[1]

---

1. As related in *Johnson I,* the relevant facts concerning the murder and armed robbery convictions at issue are as follows:

> Gary Summitt, an employee of Warrington Pharmacy and an eyewitness to the robbery and the murder, testified that while working at the pharmacy on the evening of June 7, 1978, he went to the back of the store to ask the pharmacist, Woodrow Moulton, a question. There he saw the defendant Johnson holding a gun on Moulton who was at the pharmacy safe putting articles in a bag and he

> heard Johnson order Moulton to put certain drugs and money from the safe into the bag. After obtaining the drugs and money, Johnson started towards the front of the store. Moulton then grabbed a gun from behind the prescription counter. There was an exchange of gunfire, and Moulton continued to fire at Johnson until his gun was empty. No longer able to defend himself, Moulton stood up with his hands in the air. Johnson then walked up to within a foot and a half of the defenseless pharmacist, said "You think you're a smart

On December 9, the penalty phase commenced with a hearing before an advisory sentencing jury. This jury returned a recommendation of life imprisonment on the first-degree murder conviction. Approximately one month later, on January 12, 1979, a second hearing before the sentencing judge took place. At the close of this hearing, the trial judge overrode the advisory jury's recommendation of life imprisonment and sentenced Johnson to death.[2]

Johnson appealed his conviction and death sentence to the Florida Supreme Court. In that appeal, he raised five issues.[3] Of those five issues, one—whether the trial judge's override of the advisory jury's recommendation of life was inconsistent with the standards set forth in *Tedder v. State*, 322 So.2d 908 (Fla.1975)—is also being raised during this appeal. On review of Johnson's appeal, the Florida Su-

preme Court rejected Johnson's claims attacking his conviction and his constitutional challenges to the Florida capital statute. *Johnson v. State*, 393 So.2d 1069 (Fla. 1980), *cert. denied*, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981). Although the Florida Supreme Court did set aside one of the aggravating circumstances found by the sentencing judge,[4] the court, by a vote of four justices to three, affirmed the trial judge's decision to override the jury's sentencing recommendation.

Rather than seeking habeas relief in the state courts pursuant to Florida Rule Criminal Procedure 3.850,[5] Johnson next petitioned the United States District Court for the Northern District of Florida for a writ of habeas corpus.[6] During this proceeding, Johnson raised all of the issues raised on direct appeal and several new issues as well.[7] Among the various issues he

---

son-of-a-bitch don't you?," and shot him in the chest.

... Though others were present in the pharmacy, Summitt was the only eyewitness to the robbery and murder.

*Id.* at 1480 (quotation and citation omitted).

2. The trial judge, pursuant to Florida law, *see* Fla.Stat. § 921.141(3) (1977), issued written findings in which he found that five statutory aggravating factors existed and that no mitigating circumstances were present. The five aggravating circumstances identified were: (1) Johnson was under a Tennessee sentence of imprisonment at the time of the murder, Fla.Stat. § 921.141(5)(a); (2) Johnson had previously been convicted of a felony involving the use or threat of violence to the person, Fla.Stat. § 921.141(5)(b); (3) Johnson created a great risk of death to three other persons present at the drugstore at the time of the murder, Fla. Stat. § 921.141(5)(c); (4) the capital murder was committed during the commission of an armed robbery, Fla.Stat. § 921.141(5)(d); and (5) the manner in which Johnson killed his victim was cruel and atrocious, Fla.Stat. § 921.141(5)(h). *See Johnson v. State*, 393 So.2d 1069, 1072–73 (Fla.1980), *cert. denied*, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981).

3. The challenges on direct appeal were: (1) a claim addressing the exclusion of an expert witness to testify as to the unreliability of eyewitness identification; (2) constitutional challenges that the imposition of the death penalty after the jury had recommended life imprisonment violated his right not to be subjected to double jeopardy, his right to due process, his right to trial by a jury, and his right not to be inflicted with cruel and unusual punishment; (3) a claim that the trial judge's override of the

advisory jury's recommendation of life imprisonment was inconsistent with the standards set forth in *Tedder v. State*, 322 So.2d 908 (Fla. 1975); (4) a challenge to whether improper cross-examination of his testimony by the prosecutor constituted prosecutorial misconduct and denied him a fundamentally fair trial; and (5) an attack on the trial court's decision to admit photographic evidence reconstructing the crime scene. *See generally Johnson v. State*, 393 So.2d 1069 (Fla.1980), *cert. denied*, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981).

4. The Florida Supreme Court concluded that the trial judge erred in concluding that Johnson's actions, by creating a risk of death to three persons, were sufficient to meet the requirements of Fla.Stat. § 921.141(5)(c). *Johnson v. State*, 393 So.2d at 1073.

5. During the pendency of his direct appeal, Johnson, along with 122 other individuals who received a death sentence in Florida, unsuccessfully filed an application for extraordinary relief and a petition for habeas corpus based upon an allegation that the Florida Supreme Court had a practice of reviewing *ex parte*, non-record information concerning capital defendants. *See Brown v. Wainwright*, 392 So.2d 1327 (Fla.), *cert. denied*, 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981).

6. Although Johnson had not exhausted state remedies, the state waived this defense. *Johnson I*, 806 F.2d at 1481 n. 2.

7. Among these new issues were: (1) whether the trial court's failure to consider nonstatutory

presented was a claim that the trial court did not abide by the *Tedder* standard and a claim that the trial court failed to consider nonstatutory mitigating circumstances. The district court denied the petition.

On appeal to this court, Johnson raised all but three of the claims presented to the district court. These three claims, which included the challenge to the trial judge's application of the *Tedder* standard, were deemed abandoned.[8] *Johnson I,* 806 F.2d at 1481 n. 5. The remaining claims were all addressed on their merits and rejected. *See generally Johnson I, supra.*

Johnson then returned to the Florida Supreme Court where he attempted to obtain a writ of habeas corpus and a stay of execution. During this proceeding he raised five issues, of which two—that the trial judge considered only statutory mitigating circumstances in violation of *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), and that appellate counsel was ineffective in failing to appeal the denial of a motion to suppress a pretrial photographic identification—are relevant here.[9] With two justices specially concurring, the Florida Supreme Court rejected all of these claims on their merits.[10]

*Johnson v. Dugger ("Johnson II"),* 523 So.2d 161 (Fla.1988).

Concurrently with the habeas proceedings, Johnson also filed a motion with the trial court for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. Among the claims raised in this motion were allegations (1) that his trial counsel rendered ineffective assistance by failing to obtain an independent ballistics expert and (2) that his sentencing counsel rendered ineffective assistance by failing to develop and present available psychological evidence at sentencing. The Florida Supreme Court found that these claims had not been timely filed; consequently, the court, with two justices dissenting, ruled that they were procedurally barred.[11] *Johnson v. State ("Johnson III"),* 536 So.2d 1009 (Fla.1988).

Johnson next sought relief in the instant case in federal district court. In that proceeding, Johnson raised the same five issues pending on this appeal. The district court rejected the merits of his *Hitchcock* claim and his claim that appellate counsel was ineffective. The district court did not reach the merits of Johnson's other three claims, reasoning that his challenge to the jury override constituted an abuse of the

---

mitigating factors in evidence violated due process; (2) whether the sentencing court refused to consider lingering doubt as a mitigating factor; (3) whether the Florida's Supreme Court's resolution of *Brown v. Wainwright,* 392 So.2d 1327 (Fla.), *cert. denied,* 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981), comported with due process; (4) whether the trial court and the Florida Supreme Court relied upon an erroneous factual premise by accepting as true the eyewitness's recanted testimony that Johnson said, "You think you're a smart son-of-a-bitch, don't you?" to the victim before he shot him. *See generally, Johnson I,* 806 F.2d at 1481 nn. 3 & 4.

**8.** The other two issues that were abandoned on appeal concerned the admission of photographs portraying the reconstructed crime scene and whether the Florida Supreme Court denied Johnson due process by failing to remand his case for resentencing after invalidating one of the aggravating factors.

**9.** The other three issues were that (1) appellate counsel ineffectively presented the override issue; (2) appellate counsel ineffectively challenged the aggravating circumstances found by

the district court; and (3) the excusal of two jurors pursuant to section 40.01(1), Florida Statutes (1977), which gives automatic exemption from jury service to pregnant women and women with children under the age of 15, deprived Johnson of his sixth amendment right to trial by a fair cross section of the community and violated the equal protection clause of the fourteenth amendment.

**10.** Two of the justices believed that there was a reasonable basis for the jury's recommendation of life and that the court erred in upholding the jury override on Johnson's direct appeal. They agreed with the majority, however, that the law of the case precluded a determination that Johnson could have been prejudiced by any ineffective assistance of appellate counsel concerning the override question. *Johnson v. Dugger,* 523 So.2d at 163 (Barkett, J., specially concurring).

**11.** The two dissenting justices believed that the court should, notwithstanding the procedural bar, reach what they believed were meritorious issues and hold that a new sentencing hearing was warranted. *Johnson v. State,* 536 So.2d at 1012 (Barkett, J., dissenting).

writ and that his various claims of ineffective assistance of trial and sentencing counsel were procedurally barred.

## II. THE *HITCHCOCK* CLAIM

Johnson argues that the Supreme Court's recent decision in *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), requires us to reconsider our earlier holding in *Johnson I* that the trial judge did not impermissibly limit his consideration of mitigating evidence to only those factors set forth in Fla.Stat. § 921.141(6). While we agree that *Hitchcock* "breathed new vitality into claims" raising the issue of whether the sentencing body was precluded from considering all mitigating evidence, *Hargrave v. Dugger*, 832 F.2d 1528, 1533 (11th Cir.1987) (in banc), *cert. denied*, —— U.S. ——, 109 S.Ct. 1353, 103 L.Ed.2d 821 (1989), we do not find that *Hitchcock* mandates a reversal in this case.

On his prior appeal, Johnson argued that the sentencing court refused to either consider or weigh nonstatutory mitigating circumstances. In evaluating this claim, the panel defined its task on review as follows: "we must determine whether there is any indication that the sentencing judge felt himself bound as a matter of law not to consider the mitigating circumstances offered by Johnson." *Johnson I*, 806 F.2d at 1484. After examining the transcripts during the sentencing hearing and reviewing the trial judge's comments both during the hearing and in his final order imposing death, the panel concluded that Johnson's claim was without merit:

> In the instant case there is no indication that the trial court felt itself legally bound not to consider the mitigating evidence presented by the defendant. It is true that *Alford v. State*, 307 So.2d 433 (Fla.1975), *cert. denied*, 428 U.S. 912, 96 S.Ct. 3227, 49 L.Ed.2d 1221 (1976), the case cited by the trial judge, limited the Florida courts in their consideration of nonstatutory circumstances. However, the trial court was also aware of and acted upon the decision in *Songer v. State*, 365 So.2d 696 (Fla.1978), *cert. de-*

> *nied*, 441 U.S. 956, 99 S.Ct. 2185, 60 L.Ed.2d 1060 (1979), which effectively overruled *Alford*. Moreover, the trial judge allowed Johnson to present evidence of all these mitigating circumstances to the jury for its consideration, Record on Appeal, vol. 9 at 1651, and expressly noted that he had not "disregarded any of the mitigating circumstances that were offered in evidence, either at the penalty phase or during the trial itself," *id.* at 1767. For example, the sentencing judge expressly considered the proffered factor that Johnson did not kill everyone in the store. It is of no constitutional moment that the sentencing judge evaluated the factor as having little or no mitigating value.

*Johnson I*, 806 F.2d at 1484 (footnote omitted).

To assess the impact that the Supreme Court's decision in *Hitchcock* has on this analysis, we must review *Hitchcock* in the context of both this court's in banc opinion in that case and the Supreme Court decision reversing that opinion. In *Hitchcock v. Wainwright*, 770 F.2d 1514 (11th Cir. 1985), the in banc court, after having determined that the petitioner had not been restricted in presenting mitigating evidence during the sentencing hearing, concluded that the petitioner was not denied an individualized sentencing hearing. In reversing this conclusion, the Supreme Court held that although the petitioner might have been afforded the opportunity to present mitigating evidence at the sentencing hearing, this fact, by itself, was not sufficient. Rather, a reviewing court's inquiry must focus upon (1) whether, in light of all the circumstances, the sentencing jury was instructed that it could consider all mitigating evidence, whether statutory or nonstatutory, *and* (2) whether the sentencing judge actually did consider both statutory and nonstatutory evidence. *Hitchcock*, 481 U.S. at 397, 107 S.Ct. at 1824. *See Boyde v. California*, —— U.S. ——, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990) ("The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner."); *Jones v. Dugger*, 867 F.2d 1277, 1279

(11th Cir.1989) ("The eighth amendment, which is applicable to the states through the fourteenth amendment, requires that a jury in a capital case not be precluded from considering, as a mitigating factor, *any* aspect of a defendant's character or record that the defendant proffers as a basis for a sentence less than death.") (emphasis in original).

■ In cases decided subsequent to *Hitchcock*, we have approached the issue of whether a defendant received an individualized sentencing hearing on a case-by-case basis, looking to all of the surrounding circumstances. *Delap v. Dugger*, 890 F.2d 285, 304 (11th Cir.1989); *Demps v. Dugger*, 874 F.2d 1385, 1389 (11th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1834, 108 L.Ed.2d 963 (1990); *Knight v. Dugger*, 863 F.2d 705, 708 (11th Cir.1988). In conducting this assessment, we have focused not on whether the defendant was allowed to present all mitigating evidence during the sentencing hearing, but rather on whether the sentencing jury and judge were free to, and actually did, consider any nonstatutory mitigating evidence that was presented.[12] *Delap v. Dugger*, 890 F.2d at 304; *Demps v. Dugger*, 874 F.2d at 1389 & n. 9; *Jones*, 867 F.2d at 1280.

Admittedly, there is some language in *Johnson I* that suggests too much concentration upon the former consideration. *See id.* at 1484 (" 'Our review is completed once it is established that a full hearing was conducted in which appellant's counsel was given an opportunity to present all the mitigation evidence' ") (quoting *Palmes v. Wainwright*, 725 F.2d 1511, 1523 (11th Cir.), *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984)). It is clear, however, that the panel did not rely solely upon this ground. Instead, the panel also held that the sentencing judge understood the principle of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and that the sentencing judge expressly stated that he was considering nonstatutory as well as statutory mitigating circumstances. This assessment remains unaffected by *Hitchcock*.[13]

## III. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Petitioner asserts that his appellate counsel was ineffective for not challenging the trial court's denial of his motion to suppress the in-court identification of the eyewitness, Gary Summitt. The Florida Supreme Court rejected this argument, holding that Johnson had demonstrated neither sub-standard performance nor prejudice. *Johnson II*, 523 So.2d at 163. Similarly, the district court, finding that appellate

---

**12.** This is not to say, of course, that a decision by the trial court not to allow a defendant to present nonstatutory mitigating evidence is irrelevant to the inquiry. Clearly, a defendant who is not permitted to introduce nonstatutory evidence that is potentially mitigating in nature is deprived of his or her right to an individualized sentencing hearing. *See Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). However, the fact that an individual defendant was permitted to introduce such evidence does not end our inquiry; we must still determine whether the sentencing jury and judge believed that they could consider and give proper effect to that evidence. *See Penry v. Lynaugh*, —— U.S. ——, 109 S.Ct. 2934, 2951, 106 L.Ed.2d 256 (1989); *Eddings v. Oklahoma*, 455 U.S. 104, 113–15, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1 (1982).

**13.** In reaching this conclusion, we do not swerve from the holdings in *Jones v. Dugger*, 867 F.2d 1277, 1280 (11th Cir.1989), and *Magill v. Dugger*, 824 F.2d 879, 894–95 (11th Cir.1987), that the trial court's consideration of nonstatutory mitigating factors cannot render harmless a constitutional error caused by an instruction limiting the advisory sentencing jury's consideration to only statutory mitigating factors. Both the *Jones* and *Magill* advisory juries recommended death. In both cases, the nonstatutory mitigating evidence was of such significance that this court could not say with confidence that the juries' recommendations would remain the same had they considered the evidence. Consequently, recognizing the strong presumption a trial court must accord a jury's recommendation of life imprisonment under Florida law, *see Tedder v. State*, 322 So.2d at 910, this court determined that new sentencing hearings before advisory juries were necessary.

Here, however, the sentencing jury returned an advisory sentence of life imprisonment. Hence, any errors in the advisory jury's perception of what constituted mitigating factors would be harmless. Under this circumstance, no examination of whether the jury's consideration of mitigating factors was unconstitutionally limited to those listed in the statute is necessary.

counsel's performance was not deficient, rejected this claim.[14]

■ Pursuant to the fourteenth amendment, a criminal defendant has the right to receive assistance of counsel on a direct appeal of a state conviction. *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). This right encompasses the entitlement to receive effective representation by counsel on direct appeal. *Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); *Alvord v. Wainwright,* 725 F.2d 1282, 1291 (11th Cir.), *cert. denied,* 469 U.S. 956, 105 S.Ct. 355, 83 L.Ed.2d 291 (1984). In assessing whether a defendant actually received effective assistance of appellate counsel, the standard of review is the same standard used to evaluate the performance of trial counsel. *Matire v. Wainwright,* 811 F.2d 1430, 1435 (11th Cir.1987).

Thus, to bring a successful claim of ineffective assistance of appellate counsel, petitioner must prove both that his appellate counsel's performance was deficient and that counsel's deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Matire v. Wainwright,* 811 F.2d at 1435. Only when counsel performs in an objectively unreasonable manner that falls below the wide range of competence demanded of attorneys in criminal cases can it be said that counsel's actions were deficient. *Strickland v. Washington,* 466 U.S. at 688, 104 S.Ct. at 2065; *Cross v. United States,* 893 F.2d 1287, 1290 (11th Cir.1990). This deficient performance leads to a finding of prejudice upon a showing that it is reasonably probable that the result of the proceedings would have been different absent counsel's unprofessional errors.[15] *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068; *Cross v. United States,* 893 F.2d at 1290.

■ An assessment of either the alleged deficiency in appellate counsel's performance or the resulting prejudice arising therefrom requires an initial evaluation of the merits of petitioner's claims that the trial testimony concerning eyewitness Gary Summitt's identification of a photograph of Johnson and Summitt's own in-court identification of Johnson were both so unreliable as to violate due process. *See Cross v. United States,* 893 F.2d at 1290; *Matire v. Wainwright,* 811 F.2d at 1435. *See also Funchess v. Wainwright,* 772 F.2d 683, 695 (11th Cir.1985) ("the best way to evaluate this issue is to examine the alleged trial errors to see if they contain sufficient merit to justify faulting appellate counsel for not having raised them"), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1242, 89 L.Ed.2d 349 (1986). In other words, if the underlying motion to suppress was without merit, then Johnson cannot demonstrate either deficient performance or prejudice. We, therefore, proceed with an analysis of Johnson's claim that the identification should have been suppressed.

The facts, as testified to during the suppression hearing, were uncontested.[16]

---

**14.** The state contends that this claim should be barred as constituting an abuse of the writ. Because we conclude that the claim is without merit we need not determine whether the district court abused its discretion in reaching the issue. *See Messer v. Kemp,* 831 F.2d 946, 958–59 (11th Cir.1987) (in banc), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 902 (1988).

**15.** In *Matire,* we did not resolve the issue of whether prejudice could be established by showing that there is a reasonable likelihood that but for appellate counsel's deficient behavior *the outcome of the appeal would be different* or whether prejudice could only be established by proof that there is a reasonable likelihood that *the outcome on retrial would be different. Id.* at 811 F.2d at 1439 n. 8. In a case decided subsequent to *Matire,* a panel of this court appears to have adopted the former inquiry. *Cross v. United States,* 893 F.2d at 1290 ("if we find that Cross's allegations establish a *Faretta* violation, then we would have to find appellate counsel's performance prejudicial because it affected the outcome of the appeal").

**16.** A hearing on Johnson's motion to suppress was conducted before trial. The uncontested facts established at this hearing were as follows: Summitt first saw Johnson when he went to the back of the pharmacy. Johnson was standing above the victim, Moulton, who was kneeling in front of a safe putting drugs in a bag. Johnson ordered Summitt to assist Moulton. Summitt walked over to assist Moulton. At this point, he was approximately one to one and a half feet away from Johnson and could clearly see Johnson's face. Record at 182–83. He then knelt

Within fifteen to thirty minutes of the offense, Summitt at least three times gave similar descriptions of the individual who committed the crime. He was then shown four photographs, three of Johnson and a fourth that did not meet his description. From the photographs, Summitt identified Johnson.

There is no question that the manner in which Summitt was presented with the photographs and made his identification was unduly suggestive. *See Marsden v. Moore,* 847 F.2d 1536, 1545 (11th Cir.) (procedure unduly suggestive when witness shown only three pictures—one of the defendant, one of the defendant and his wife, one of the defendant's wife), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); *Dobbs v. Kemp,* 790 F.2d 1499, 1506 (11th Cir.1986) (photographic identification procedure unduly suggestive where one victim only shown four photographs of the defendant and other witness shown 12 photographs, four of which were of the defendant and two of which were of individuals of a different race), *modified on reh'g,* 809 F.2d 750 (11th Cir.), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2203, 95 L.Ed.2d 858 (1987). However, that fact in and of itself is not sufficient to constitute reversible error. Rather, in order to prove that eyewitness testimony identifying the defendant as the individual who committed the crime was so tainted as to be unreliable,

Johnson must also establish that the officers' actions in showing Summitt the photographs created a substantial risk of misidentification. *Dobbs v. Kemp,* 790 F.2d at 1506; *United States v. Cannington,* 729 F.2d 702, 711 (11th Cir.1984). In other words, notwithstanding an unduly suggestive photograph identification procedure, testimony concerning an eyewitness's identification of the defendant is admissible if, under all of the circumstances, the witness's identification of the defendant is reliable. *Manson v. Brathwaite,* 432 U.S. 98, 114–17, 97 S.Ct. 2243, 2253–54, 53 L.Ed.2d 140 (1977); *Hudson v. Blackburn,* 601 F.2d 785, 788 (5th Cir.1979), *cert. denied,* 444 U.S. 1086, 100 S.Ct. 1046, 62 L.Ed.2d 772 (1980); *United States v. Gidley,* 527 F.2d 1345, 1350 (5th Cir.), *cert. denied,* 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976).

Looking to some of the relevant factors to be considered in evaluating the reliability of the identification—"the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation," *Hudson v. Blackburn,* 601 F.2d at 788; *see Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972)—we

---

beside Moulton and helped put drugs in the bag. On several occasions, he looked back to Johnson to ask what other drugs should be put in the bag. *Id.* at 183. Given the good lighting in the pharmacy, *id.* at 184, Summitt was able to see Johnson's features quite clearly. *Id.* at 186.

After Moulton was shot and Johnson had fled, Summitt then, on at least three different occasions, gave different officers a consistent description of the individual who had committed the offense. These descriptions, each of which were given within fifteen to thirty minutes of the offense, *id.* at 176, were virtually identical in content. *See id.* at 174, 188, 190–91 (testimony of Summitt); *id.* at 194 (testimony of Investigator Penton of radio bulletin); *id.* at 195 (testimony of Investigator Penton as to description given by Summitt); *id.* at 206–08 (testimony of Investigator Smith as to description given by

Summitt); *id.* at 221 (testimony of Deputy Sheriff Lewis).

After hearing this description, at least two of the officers believed the individual described to be Marvin Johnson. Within Summitt's earshot, one of the officers asked if anyone had any pictures of Johnson. After one of the officers retrieved some photographs from his car, he proceeded to show four pictures, three of which were of Johnson, to Summitt. Summitt, after looking at the pictures for four or five seconds, positively identified the three pictures of Johnson as portraying the individual who had shot Moulton and robbed the pharmacy. *Id.* at 176–77, 197, 201–02, 212. Both Summitt and the officers testified that Summitt was confident in his identification of Johnson.

Upon hearing Summitt's identification, the officers, while still in Summitt's presence, ex-

find that there was no likelihood of mis-identification in this case.[17] Summitt was able to view Johnson's face several times from a distance of no more than one and a half feet. He gave consistent detailed descriptions of Johnson's facial appearance and attire. When presented with Johnson's photographs within thirty minutes of the offense, he confidently identified Johnson as the offender. Similarly, without hesitation, he rebuffed a rather difficult trial cross-examination which challenged his physical and mental condition immediately after the offense and identified Johnson as the individual who committed the crime.

These factors indicate that the testimony concerning Summitt's identification of Johnson was sufficiently reliable to outweigh the corruptive effect of the suggestive identification procedure. *See Allen v. Estelle*, 568 F.2d 1108, 1113 (5th Cir.1978) (final step of analysis is to weigh the factors supporting reliability of the evaluation against the corrupting effect of the suggestive identification). Given this conclusion, Johnson's claim that his appellate counsel was ineffective for not raising this claim on direct appeal must fail. *See Cross v. United States*, 893 F.2d at 1292; *Funchess v. Wainwright*, 772 F.2d at 695 ("counsel is not to be faulted for failing to raise issues reasonably considered to be without merit").

---

pressed their view that they thought the description sounded like Marvin Johnson.

17. Although the trial court held a hearing on the motion to suppress, it never issued any findings of fact. Similarly, no findings of fact were made by the Florida state courts or the district court in evaluating this claim. We need not remand this issue to the district court for an evidentiary hearing or for findings of fact, however, because there are no disputed facts as to the actual events that transpired. *See Bloodworth v. Hopper*, 539 F.2d 1382, 1384 (5th Cir. 1976) (where facts are undisputed, resolution of the question as to whether the identification of the defendant is independently reliable concerns only an application of law); *see also Cikora v. Dugger*, 840 F.2d 893, 896 (11th Cir.1988) (observing that while each relevant factor in determining whether an identification is reliable is a finding of fact, the ultimate determination as to the reliability of the identification is a question of law).

## IV. MISAPPLICATION OF THE *TEDDER* STANDARD

Johnson contends that the trial court's decision to override the jury's recommendation of life imprisonment was unauthorized under Florida law, and that if not set aside, this decision represents an arbitrary application of the death penalty. He premises this claim on the standard announced in *Tedder v. State*, 322 So.2d 908, 910 (Fla. 1975), which mandates that "[i]n order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ."

Twice the Florida courts have reviewed this claim. On direct appeal of his conviction and sentence, the Florida Supreme Court by a bare majority upheld the trial court's override of the jury's recommendation, reasoning that while "the jury recommendation is to be accorded great weight," the facts in Johnson's case supported imposition of the death penalty. *Johnson v. State*, 393 So.2d at 1074 ("There are no mitigating circumstances, statutory or otherwise, and there are four valid aggravating circumstances. We conclude that death is the appropriate sentence to be imposed for this atrocious and cruel execution murder committed during the commission of an armed robbery by an escaped convict who previously had been convicted of felonies involving the use or threat of violence").[18]

18. The three dissenting justices believed that certain nonstatutory mitigating factors were *present which a reasonable jury could have* relied upon in finding that the mitigating circumstances outweighed the aggravating circumstances. These justices believed that the manner in which the murder was committed was not so extraordinary as to warrant the death penalty. *Johnson v. State*, 393 So.2d at 1075 (Sundberg, J., concurring in part and dissenting in part). Moreover, they believed that a reasonable jury could have taken into consideration the facts that Johnson was apparently leaving the store when the victim of the murder initiated the shoot-out which culminated in his death and that Johnson demonstrated mercy by not harming any of the other individuals in the store, including Summitt, the eyewitness to the entire events. *Id.; id.* at 1076 (McDonald, J., dissenting).

The Florida Supreme Court again rejected this claim when Johnson raised it in his application for a writ of habeas corpus and a stay of execution. *Johnson II*, 523 So.2d at 162.[19]

Without reaching the merits, the district court rejected Johnson's claims concerning the jury override issue. The court noted that this was Johnson's second federal habeas petition and that Johnson should have pursued the issue during the pendency of his prior federal proceedings. We agree. Johnson raised this claim in his first habeas corpus petition filed in federal district court, but abandoned the claim on appeal. With no explanation for his prior conduct, he now argues that the "ends of justice" require consideration of this issue on this appeal.

Although the exact contours of what constitutes the "ends of justice" sufficient to excuse an abuse of the writ are somewhat illusory, *see* Section V.D.2, *infra*, a review of the merits of Johnson's claims convinces us that no proper showing has been made concerning his jury override claims. *See Messer v. Kemp*, 831 F.2d 946, 958–59 (11th Cir.1987) (in banc) ("Because we conclude, as a matter of law, that the record in this case fails to disclose [the alleged constitutional violation], our 'ends of justice' analysis need not proceed any further."), *cert. denied*, 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 902 (1988).

In *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), the Supreme Court held that Florida's statutory scheme in which a sentencing judge can override an advisory sentencing jury's recommendation of life imprisonment is constitutionally permissible. In reaching this conclusion, the Court rejected the notion that an individual has a constitutional right to have a jury determine the appropriateness of the imposition of a capital sentence. *Id.* at 460–65, 104 S.Ct. at 3162–65. *See also Clemons v. Mississippi*, — U.S. ——, 110 S.Ct. 1441, 1446–47, 108 L.Ed.2d 725 (1990) (summarizing holdings).

■ The fact that the Supreme Court has approved the structural framework of the Florida sentencing process does not mean, however, that a trial judge's decision to override an advisory jury's recommendation of life imprisonment is wholly insulated from federal habeas review. Federal courts still maintain the responsibility for ensuring that the trial court's decision to override the jury's recommendation in any particular case does not result in an arbitrary or discriminatory application of the death penalty. *Spaziano v. Florida*, 468 U.S. at 465, 104 S.Ct. at 3165; *Lusk v. Dugger*, 890 F.2d 332, 342 (11th Cir.1990); *Parker v. Dugger*, 876 F.2d 1470, 1474–75 (11th Cir.1989), *cert. granted*, — U.S. ——, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1990). Federal court review in this area, however, is not without limitation; to the contrary, our review is quite circumscribed:

> It is not our function to decide whether we agree with the advisory jury or with the trial judge and the Supreme Court of Florida. Our review, rather, is limited to ascertaining whether the *result* of the override scheme is arbitrary or discriminatory.

*Lusk v. Dugger*, 890 F.2d at 342 (emphasis in original).

■ In other words, federal court review does not encompass an inquiry as to whether the trial judge's decision to override the jury's recommendation of life imprisonment is consistent with the state law standards established in *Tedder* and its progeny. *See Lusk v. Dugger*, 890 F.2d at 342; *Parker v. Dugger*, 876 F.2d at 1475. The answer to that question is solely an issue of state law and it is not within our province to second-guess that result. *Spaziano v. Florida*, 468 U.S. at 465, 104 S.Ct. at 3154. Instead, our review of a particular case challenging the state court's approval of trial court override of jury's life recommendation is limited to whether the imposition of the death penalty in that given case is either arbitrary or discriminatory. *Id.*

■ Johnson points to four factors which he contends warrant a conclusion that the "ends of justice" mandate setting

**19.** Two justices specially concurred with this holding. *See* note 10, *supra*.

aside the death penalty in his case: First, he points to the fact that only a bare majority of the Florida Supreme Court thought the trial court's override of the jury's recommendation was proper on direct appeal. *Johnson v. State,* 393 So.2d at 1074; *id.* at 1075 (Sundberg, C.J., concurring in part and dissenting in part); *id.* at 1075 (McDonald, J., dissenting). Second, he contends that in *Johnson II,* the Florida Supreme Court intimated that his jury override would not be acceptable if presented today, but that the court, invoking the "law of the case" doctrine, refused to reverse the death penalty. *See Johnson II,* 523 So.2d at 162 ("even though the jury override might not have been sustained today, it is the law of the case. In view of the Court's prior consideration of this issue, there has been no showing of prejudice"). Third, he argues that a majority of the present Florida Supreme Court has clearly stated that imposition of the death penalty is improper in his case.[20] And finally, he points to *Cochran v. State,* 547 So.2d 928, 933 (Fla.1989) (per curiam), in which he argues that the Florida Supreme Court has expressly conceded that it currently applies the *Tedder* standard in a manner different-

ly from the manner in which it was applied during the pendency of his direct appeal.[21] These four factors, he argues, inextricably lead to the conclusion that his sentence of death represents an arbitrary imposition of death.

Although Johnson's arguments have considerable force, to the extent that they are directed to the federal courts, they ultimately must fail.[22] Admittedly, the fact that there is an indication that the jury override decision might not be sustained had it been appealed to the Florida Supreme Court today is some indication of arbitrariness. However, we cannot conclude that the decision not to set aside the trial court's decision rises to the required constitutional level of arbitrariness. "A state imposes punishment arbitrarily 'when, without reason, it inflicts upon some people a severe punishment that it does not inflict upon others.'" *Parker v. Dugger,* 876 F.2d at 1476 (quoting *Furman v. Georgia,* 408 U.S. 238, 274, 92 S.Ct. 2726, 2744, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring)).

Here, the Florida Supreme Court, by invoking "law of the case," determined that

---

**20.** Of the current 7 members on the Florida Supreme Court, two, Chief Justice McDonald and Justice Overton, expressed their view that the jury override was improper on Johnson's direct appeal. Two other members of the court, Justices Barkett and Kogan, agreed with the majority in *Johnson II* that the "law of the case" precluded further consideration of the jury override issue, but expressed their disagreement with the prior determination on direct appeal upholding the jury override. 523 So.2d at 163 (Barkett, J., specially concurring) ("I agree that we are bound by the law of the case on the jury override issue. However, I believe there was a reasonable basis for the jury's recommendation of life and thus that the court originally erred in sustaining the jury override").

**21.** In *Cochran,* the Florida Supreme Court rejected the dissent's arguments that the trial court's override of the jury's life recommendation was proper. In so doing, the court noted that all of the cases relied upon by the dissenting justices were decided in 1984 and thus were not indicative of the court's current posture:

[I]n expounding upon this point to prove that *Tedder* has not been applied with the force suggested by its language, the dissent draws entirely from cases occurring in 1984 or earlier. This is not indicative of what the present

court does, as Justice Shaw noted in his special concurrence in *Grossman v. State,* 525 So.2d 833, 851 (Fla.1988) (Shaw, J., specially concurring):

During 1984–85, we affirmed on direct appeal trial judge overrides in eleven of fifteen cases, seventy-three percent. By contrast, during 1986 and 1987, we have affirmed overrides in only two of eleven cases, less than twenty percent. This current reversal rate of over eighty percent is a strong indicator to judges that they should place less reliance on their independent weighing of aggravation and mitigation....

Clearly, since 1985 the Court has determined that *Tedder* means precisely what it says, that the judge must concur with the jury's life recommendation unless "the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ." *Tedder,* 322 So.2d at 910.

*Cochran,* 547 So.2d at 933.

**22.** This conclusion, of course, does not mean that Johnson is wholly without recourse. The fact that a majority of the current state supreme court has evidenced disapproval of Johnson's death penalty may well be influential in any state clemency proceedings that might be initiated.

it would not revisit its earlier determination that not only were there no mitigating circumstances to support the jury's recommendation of life imprisonment, but that there were four aggravating circumstances present. Given those facts, the court concluded on direct appeal "that the facts suggesting the death sentence are so clear and convincing that virtually no reasonable person could differ." *Johnson,* 393 So.2d at 1074.

The court's invocation of the "law of the case" doctrine in *Johnson II* was not constitutionally arbitrary. The Florida courts have relied upon the "law of the case" doctrine "in order to lend stability to judicial decisions and the jurisprudence of the state, as well as to avoid 'piecemeal' appeals and to bring litigation to an end as expeditiously as possible." *Strazzulla v. Hendrick,* 177 So.2d 1, 3 (Fla.1965). We have ourselves recognized that this doctrine "operates to create efficiency, finality and obedience within the judicial system." *Litman v. Massachusetts Mutual Life Insurance Co.,* 825 F.2d 1506, 1511 (11th Cir.1987) (in banc), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 652 (1988).

In refusing to review claims on habeas that it has already determined adversely to the petitioner on direct appeal, the Florida Supreme Court has emphasized the state's significant interest in obtaining finality of judgments. *See, e.g., Porter v. Dugger,* 559 So.2d 201 (Fla.1990); *Kennedy v. Wainwright,* 483 So.2d 424, 426 (Fla.), *cert. denied,* 479 U.S. 890, 107 S.Ct. 291, 93 L.Ed.2d 265 (1986). Given the recognized and significant interest that a state has in reaching finality in its criminal judgments, *cf. Butler v. McKellar,* —— U.S. ——, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990); *Saffle v. Parks,* —— U.S. ——, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990); *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 1074–75, 103 L.Ed.2d 334 (1989), we cannot conclude in this case that the state's invocation of the "law of the case" doctrine constitutes an arbitrary decision justifying federal court intervention. In *Johnson v. State,* 393 So.2d at 1074, the Florida Supreme Court affirmed the trial court's determination that there were four statutory aggravating factors and no mitigating factors whatsoever. In light of the foregoing, we find that imposition of the death penalty in this case was not unconstitutionally arbitrary.[23] *See Spaziano v. Florida,* 104 S.Ct. at 3166; *Lusk v. Dugger,* 890 F.2d at 342; *Parker v. Dugger,* 876 F.2d at 1475–76.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING

Johnson claims that he received ineffective assistance of counsel during the sentencing phase of his state court trial. He contends that the counsel employed at sentencing and the psychiatrist who assisted counsel were woefully unprepared to put on an effective defense. He also alleges that counsel inexplicably failed to inform his psychiatrist of his 25–year history of multiple drug abuse and addiction. Had this evidence been developed, he charges, sentencing counsel would have been able to create a record that probably would have influenced the sentencing judge to honor the jury verdict and, in any event, would have prompted the Florida Supreme Court to implement the *Tedder* standard precluding the override.

Without a hearing, the district court rejected this claim as being procedurally barred. The court noted that Johnson sought to raise this claim in his Florida Rule 3.850 proceedings. The Florida Supreme Court, however, rejected this claim, finding that Johnson had not filed his Rule 3.850 petition within the rule's time constraints, and that consequently, review on the merits was barred. *Johnson III, supra.*

---

**23.** The fact that various of the state court justices are in disagreement over whether the *Tedder* standard was applied appropriately in Johnson's direct appeal does not implicate a federal constitutional right warranting federal court intervention. Our inquiry is not "whether 'reasonable people' could differ over the result here"; it is instead only whether the imposition of the death penalty is irrational or arbitrary. *Spaziano v. Florida,* 468 U.S. at 467, 104 S.Ct. at 3166. Given the state court factual findings concerning aggravating and mitigating factors present, we cannot conclude that Johnson's death sentence is either irrational or arbitrary.

## A. Procedural Default

The doctrine of procedural default is grounded upon considerations of comity and concerns for the orderly administration of criminal justice. *Murray v. Carrier*, 477 U.S. 478, 490–91, 106 S.Ct. 2639, 2646–47, 91 L.Ed.2d 397 (1986); *Harmon v. Barton*, 894 F.2d 1268, 1270 (11th Cir.1990). The doctrine was developed as a means to ensure that petitioners would first seek relief in accordance with existing state procedures. *See Presnell v. Kemp*, 835 F.2d 1567, 1578–79 (11th Cir.1988), *cert. denied*, 488 U.S. 1050, 109 S.Ct. 882, 102 L.Ed.2d 1004 (1989). By channeling petitioners' claims initially into the state courts for resolution, the doctrine vindicates the state's interest in the integrity of its proceedings and gives due recognition to state rules designed to promote accuracy, efficiency, and finality of judicial decisions. *Reed v. Ross*, 468 U.S. 1, 10, 104 S.Ct. 2901, 2907, 82 L.Ed.2d 1 (1984).

In practice, the procedural default rule creates an incentive for petitioners to utilize state rules and proceedings by imposing a severe limitation on petitioners' ability to present claims in federal courts that were not initially raised in accordance with state rules of procedure. For example, petitioners who fail to abide by state court rules requiring a timely objection at trial will find that their ability to raise such claims in federal courts is severely circumscribed. *See, e.g., Engle v. Isaac*, 456 U.S. 107, 124–29, 102 S.Ct. 1558, 1570–72, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 88–91, 97 S.Ct. 2497, 2507–08, 53 L.Ed.2d 594 (1977). Similarly, petitioners who fail to raise appropriate issues on direct appeal, *see Smith v. Murray*, 477 U.S. 527, 533, 106 S.Ct. 2661, 2665–66, 91 L.Ed.2d 434 (1986); *Murray v. Carrier*,

477 U.S. at 490–92, 106 S.Ct. at 2646–47, or who fail to abide by a state rule governing the manner in which claims should be presented in a state collateral attack, *see Whiddon v. Dugger*, 894 F.2d 1266, 1267 (11th Cir.1990); *Presnell v. Kemp*, 835 F.2d at 1580, may also find that federal court review of their constitutional claims is not available.

However, the constraints that the procedural default doctrine place on federal court review of federal constitutional claims are not without limit. In recognition of the important role that federal courts play in vindicating the constitutional rights of state prisoners, *see Reed v. Ross*, 468 U.S. at 10, 104 S.Ct. at 2907 ("There can be no doubt that in enacting § 2254, Congress sought to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action") (quotation and citation omitted), certain criteria have been established which must be met before federal judicial review will be barred. First, the last state court to review the petitioner's claim must clearly and expressly rely upon its state procedural rule in its explanation why it is refusing to hear the petitioner's claim.[24] *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989); *Richardson v. Thigpen*, 883 F.2d 895 (11th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 17, 106 L.Ed.2d 631 (1989). A state court's failure to give a "plain statement" explicitly relying upon a state law ground will result in the procedural default doctrine being inapplicable. *Harris v. Reed*, 489 U.S. at —, 109 S.Ct. at 1045; *see Oliver v. Wainwright*, 795 F.2d 1524, 1529 (11th Cir.1986), *cert. denied*, 480 U.S. 921, 107

---

24. We have recognized two caveats to this requirement. First, we have held that the "final" state court decision to be looked to in determining whether the procedural bar was applied is "the last state court that rendered judgment *and* provided reasons for the judgment." *Harmon v. Barton*, 894 F.2d at 1273 (emphasis in original) (footnote omitted) (holding that per curiam affirmance by state appellate court of trial court's conclusion that the claim raised was procedurally barred resulted in procedural default). Additionally, we have recently held that a petition-

er cannot avoid this requirement by withholding a given claim from the state courts. *See Parker v. Dugger*, 876 F.2d at 1477–78. In other words, in a case in which it is clear that a petitioner's constitutional claim would be barred under a state procedural rule, a petitioner cannot evade this bar by forsaking an available state remedy in which that bar would be imposed. *Id.; see Harris v. Reed*, 489 U.S. at —, 109 S.Ct. at 1043 n. 9; *id.* at —, 109 S.Ct. at 1047 (O'Connor, J., concurring); *Toles v. Jones*, 888 F.2d 95, 99 (11th Cir.1989).

S.Ct. 1380, 94 L.Ed.2d 694 (1987). Second, the procedural rule relied upon by the state court must serve as an independent state law ground for denying relief. *Harris v. Reed,* 489 U.S. at ——, 109 S.Ct. at 1042. Although a state court may reach the merits of the petitioner's federal law claim in an *alternative* holding, *id.,* 489 U.S. at ——, 109 S.Ct. at 1044 n. 10; *Dobbert v. Strickland,* 718 F.2d 1518, 1524–25 (11th Cir.1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984), its invocation and reliance upon a state procedural rule must be premised solely on an interpretation of state law. *See Caldwell v. Mississippi,* 472 U.S. 320, 328, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985); *Ake v. Oklahoma,* 470 U.S. 68, 75, 105 S.Ct. 1087, 1092, 84 L.Ed.2d 53 (1985). And finally, the state procedural rule must be adequate: that is, it must not be one that has been inconsistently interpreted or irregularly applied, *see Johnson v. Mississippi,* 486 U.S. 578, 587, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575 (1988); *Francois v. Wainwright,* 741 F.2d 1275, 1281 (11th Cir.1984), or that is manifestly unfair in its treatment of petitioner's constitutional claim, *see Oliver v. Wainwright,* 795 F.2d at 1529; *Spencer v. Kemp,* 781 F.2d 1458, 1470–71 (11th Cir. 1986) (in banc); rather, it must be a rule that the state court has faithfully applied in relevant cases. *See Dugger v. Adams,* 489 U.S. 401, 109 S.Ct. 1211, 1217 n. 6, 103 L.Ed.2d 435 (1989); *Smith v. Dugger,* 840 F.2d 787, 796 (11th Cir.1988), *cert. denied,* —— U.S. ——, 110 S.Ct. 1511, 108 L.Ed.2d 647 (1990).

Additionally, in recognition of the fact that the procedural default rule is an equitable rule that should not preclude the correction of a fundamental miscarriage of justice, the Supreme Court has carved out two exceptions to the doctrine's applicability. Under the first exception, an adequate and independent finding of state law procedural default will not bar federal habeas review of federal claims if the petitioner can show both " 'cause' for the default and 'prejudice attributable thereto.' " *Harris v. Reed,* 489 U.S. at ——, 109 S.Ct. at 1043 (quoting *Murray v. Carrier,* 477 U.S. at 495, 106 S.Ct. at 2649); *Engle v. Isaac,* 456

U.S. at 129, 102 S.Ct. at 1573; *Wainwright v. Sykes,* 433 U.S. at 90–91, 97 S.Ct. at 2508.

Although the Supreme Court believed that application of this "cause and prejudice" standard would correct the vast majority of instances in which a state petitioner was a victim of a fundamental miscarriage of justice, the Court recognized that in certain extraordinary cases, that might not be so. Accordingly, the Court carved a second, significantly more narrow exception to encompass those cases in which an individual was subjected to a fundamentally unjust incarceration: "where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier,* 477 U.S. at 496, 106 S.Ct. at 2649.

**B.** *Johnson Cannot Establish Cause for his State Procedural Default*

■ Johnson first raised this ineffective assistance of counsel claim in *Johnson III, supra.* The Florida Supreme Court did not address the claim on the merits; instead, it concluded that because Johnson had failed to file his motion for postconviction relief within the two-year time limit imposed by Fla.R.Crim.P. 3.850, this claim was untimely filed. 536 So.2d at 1011.

The Florida court's invocation of its two-year statute of limitations for commencing a state collateral proceeding constitutes an "adequate and independent state ground" for refusing to consider this federal claim. *Whiddon v. Dugger,* 894 F.2d at 1267–68. Thus, before we can review Johnson's claim, he must either establish cause and prejudice or show that refusal to consider the claim would result in a fundamental miscarriage of justice. *Id.* at 1267–68 and n. 2 (failure to comply with Rule 3.850's time limitations is reviewed under the "cause and prejudice" standard and not the "deliberate bypass" standard set forth in *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963)). *See generally Presnell v. Kemp,* 835 F.2d 1567 (11th Cir.1988) ("cause and prejudice" standard for evalu-

ating claims that are procedurally barred due to petitioner's failure to present claims seasonably to state habeas court), *cert. denied,* 488 U.S. 1050, 109 S.Ct. 882, 102 L.Ed.2d 1004 (1989).

Johnson first argues that he can establish cause for his procedural default in state court. He claims that he instructed his attorneys handling his state court collateral challenges to raise all possible grounds including an ineffective assistance of counsel claim premised upon a lack of investigation into his psychological well-being.[25] The Florida Supreme Court found that Johnson's post-conviction counsel's failure to file a timely Rule 3.850 motion was attributable to an exercise of what, at least in retrospect, was a badly flawed exercise in judgment. *See Johnson III,* 536 So.2d at 1011 ("counsel in the postconviction hearing candidly stated that when Johnson's lawyers decided to go to federal court, they elected to raise only certain claims and assumed that they could always come back to state court and raise others"). These errors on the part of collateral counsel, he contends, amount to ineffective assistance of counsel which constitutes the necessary cause to excuse his procedural default.

Although the Supreme Court has declined "to essay a comprehensive catalog of the circumstances that would justify a finding of cause," *Smith v. Murray,* 477 U.S. at 533–34, 106 S.Ct. at 2666, the Court has given some indications as to what does and does not constitute cause. For example, claims that compliance with a state procedural rule would be futile given the state court's past treatment of a particular issue cannot constitute cause. *Engle v. Isaac,* 456 U.S. at 130, 102 S.Ct. at 1573. Similarly, actions of counsel, be they motivated by tactical or deliberate thought, *see Smith v. Murray,* 477 U.S. at 535–36, 106 S.Ct. at 2666–67; *Reed v. Ross,* 468 U.S. at 14, 104 S.Ct. at 2909, or through inadvertence or error, *see Murray v. Carrier,* 477 U.S. at

487–88, 106 S.Ct. at 2644–45, will not constitute cause.

On the other hand, if a petitioner can show that the procedural default is the result of ineffective assistance of trial or appellate counsel, then cause for the default will be established. *Murray v. Carrier,* 477 U.S. at 488, 106 S.Ct. at 2645. Similarly, cause will be found in instances in which a petitioner can "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* Thus, cause for failure to comply with a procedural rule may be established by a showing that the factual or legal basis for a claim was not reasonably available to the petitioner, *see Amadeo v. Zant,* 486 U.S. 214, 222–24, 108 S.Ct. 1771, 1777, 100 L.Ed.2d 249 (1988); *Reed v. Ross,* 468 U.S. at 15–16, 104 S.Ct. at 2910, that interference by state officials made compliance impossible, *see Dowd v. United States ex rel. Cook,* 340 U.S. 206, 71 S.Ct. 262, 263–64, 95 L.Ed. 215 (1951), or that the procedural default was caused by some other factors outside of either the petitioner's or his counsel's control. *See, e.g., Alexander v. Dugger,* 841 F.2d 371, 374 (11th Cir.1988) (delays in mail); *Meagher v. Dugger,* 861 F.2d 1242, 1245–46 (11th Cir.1988) (same).

The Supreme Court has not yet addressed the precise claim of cause alleged here: namely, whether cause may be established with proof that the procedural default was a result of the errors of counsel in state court collateral proceedings. A recent panel of this court, however, has addressed this very contention and rejected it. *Toles v. Jones,* 888 F.2d 95, 99–100 (11th Cir.1989) (per curiam) (rejecting argument that cause for procedural default may be attributed to the inadequate assistance of court-appointed counsel during state court collateral proceedings: "Since [petitioner] had no constitutional right to coram nobis counsel, he cannot excuse a procedural default based upon ineffective assistance rendered by that counsel") (citations omitted);[26] *see also Whiddon v. Dugger,* 894

---

25. Supplemental Appendix 1 (Affidavit of Marvin Johnson).

26. Since this opinion was authored, the panel opinion in *Toles v. Jones* has been vacated for reconsideration by the in banc court. Should

F.2d at 1267 ("[b]ecause there is no right to legal counsel in collateral proceedings, poor advice about such proceedings from a state-provided lawyer or inmate law clerks will not establish petitioner's claim of 'cause' "). *Accord Coleman v. Thompson,* 895 F.2d 139, 144 (4th Cir.1990). Thus, while we recognize the fact that one of our sister circuits has applied an ineffective assistance analysis to determine whether the failure of an attorney to raise an issue on a state collateral challenge constitutes cause, *see Harper v. Nix,* 867 F.2d 455, 457 (8th Cir.1989), *Stokes v. Armontrout,* 851 F.2d 1085, 1092–93 (8th Cir.1988), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 823, 102 L.Ed.2d 812 (1989), and that the Seventh Circuit has in dicta expressed conflicting views as to whether such a showing may constitute cause, *compare Madyun v. Young,* 852 F.2d 1029, 1033 n. 2 (7th Cir. 1988) (may constitute cause); *Buelow v. Dickey,* 847 F.2d 420, 426 (7th Cir.1988) (cannot establish cause), *cert. denied sub nom. Buelow v. Bablitch,* —— U.S. ——, 109 S.Ct. 1168, 103 L.Ed.2d 227 (1989); *Morrison v. Duckworth,* 898 F.2d 1298 (7th Cir.1990) (might sometimes constitute cause), we are constrained by prior precedent to reject this proffer of cause.[27]

C. *A Remand is Necessary to Determine Whether Johnson's Claims Must be Heard to Avoid a Fundamental Miscarriage of Justice*

Johnson also argues that the errors of his trial counsel in not presenting relevant mitigating evidence are of such a magnitude that the second exception to the procedural default doctrine must be invoked.

He argues that to do otherwise would be to condone the imposition of the death sentence on an individual who, under Florida state law, would otherwise not be put to death. Therefore, he asserts, this court must exercise its equitable powers and consider his claim in order to prevent a fundamental miscarriage of justice.

It is well-recognized that, in certain extraordinary circumstances, a federal court has the inherent, equitable power to consider an issue notwithstanding the existence of a procedural bar. *See Smith v. Murray,* 477 U.S. at 537, 106 S.Ct. at 2668; *Murray v. Carrier,* 477 U.S. at 495–96, 106 S.Ct. at 2649. The more difficult determination is delineating what circumstances are sufficiently compelling to authorize federal court intervention. *See* 17A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 4266.1 at 467 (1988 & Supp.1989). Because prior precedent suggests that the ultimate determination as to whether federal intervention is warranted is inextricably linked to the actual allegations raised in the petitioner's claim, *see Dugger v. Adams,* 489 U.S. at ——, 109 S.Ct. at 1217 n. 6; *Smith v. Murray,* 477 U.S. at 538, 106 S.Ct. at 2668, we find it advisable, before inquiring whether Johnson's allegations and proffer of proof are sufficient to warrant federal consideration, to first examine the substantive content of his claim. *Cf. Messer v. Kemp,* 831 F.2d at 958–59.

1. Johnson's Claim of Ineffective Assistance of Sentencing Counsel

Johnson's claim of ineffective assistance of sentencing counsel is premised upon the

---

the in banc court reverse the panel's decision and conclude that ineffective assistance of collateral counsel can satisfy the cause requirement, then, in addition to conducting an evidentiary hearing to determine whether federal court intervention is necessary to prevent a fundamental miscarriage of justice, *see* Section V.C.2, *infra,* the district court is instructed to hold an evidentiary hearing to determine whether the actions of collateral counsel in this case satisfy the standards established by the in banc court in *Toles.* On the other hand, should the in banc court adopt the panel's position in *Toles,* then no hearing on this issue will be necessary.

27. *But see* note 26, *supra.* Johnson also argues that one of his attorneys on direct appeal assisted the attorneys handling his collateral attack, and thus that the collateral attorneys could not challenge the effectiveness of one of their own. *See Stephens v. Kemp,* 846 F.2d 642, 651 (11th Cir.), *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988). Assuming arguendo that there is a genuine issue of fact as to whether counsel on direct appeal was part of the collateral team, the issue now before us relates to the ineffective assistance of counsel at sentencing. There is no contention that any such conflict of interest hindered the challenge to the performance of sentencing counsel.

alleged failure of his attorney and court-appointed psychologist to conduct a competent investigation concerning his mental and psychological state prior to sentencing. Had they done so, he alleges, they would have discovered severe psychological disabilities resulting from his prolonged and obsessive history of drug consumption. Relying upon *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which guarantees a criminal defendant the right to effective assistance of counsel, Johnson contends that had his counsel and psychologist developed an adequate psychological profile of his condition, they would have discovered more than sufficient evidence to support findings of at least three statutory mitigating factors. These findings, he charges, would have precluded the trial court's jury override.

Johnson's counsel at sentencing were not involved in his defense during any of the preliminary proceedings, the jury voir dire, or the actual trial, nor did they attend those proceedings.[28] Although the sentencing hearing took place the day after the conviction was announced, sentencing counsel did not attempt to procure the services of a psychologist to examine Johnson until after conviction.[29] Upon locating a psychologist, Dr. Ronald Yarbrough, they then proceeded to the jail where Johnson was being held. It was not until 11:00 p.m. that night that Dr. Yarbrough was finally able to meet with Johnson at the jail.[30] Given the lateness of the hour and the fact that the sentencing proceeding was scheduled for the next day, Dr. Yarbrough was able to conduct only a brief two and one-half hour diagnostic interview in which he administered various psychological tests. This interview was to form the sole basis of Dr. Yarbrough's testimony at the sentencing hearing.

The testimony Dr. Yarbrough gave at the jury sentencing hearing, Johnson charges, was premised upon a woefully incomplete psychological examination. At the hearing, Dr. Yarbrough, although unable to offer any conclusions concerning Johnson's mental and psychological stability, testified that from his very brief diagnostic interview with Johnson he was able to develop "some strong hypotheses" concerning Johnson's condition.[31] He testified that Johnson probably had a high average range of intelligence and an extremely high level of common sense.[32] He further offered his impression that Johnson appeared in touch with reality [33] and was capable of immediately grasping situations that confront him.[34] According to Dr. Yarbrough's testimony, Johnson evidenced no signs of organic brain damage,[35] and there was no evidence that he lacked the capacity to appreciate the criminality of his conduct.[36] The only evidence that Dr. Yarbrough was effectively able to offer in mitigation was an opinion that Johnson's normal ability to function deteriorates significantly when confronted with a stressful situation.[37]

This psychological assessment was severely flawed, Johnson now charges, by his sentencing counsel's failure to provide Dr. Yarbrough with any information indicating Johnson's almost 25–year history of severe, multiple drug addiction. As Dr. Yarbrough concedes in an affidavit filed with Johnson's petition for federal habeas corpus, at the time that he testified before the

---

**28.** Petition at 78; Appendix 4 (Affidavit of Terry Terrell).

**29.** Record at 1619. Not until the day before the sentencing hearing did counsel even file a motion requesting the funds necessary to pay an examining psychologist. Record at 1672. This motion was argued and granted on the morning of the sentencing hearing. Record at 1619–22.

**30.** Record at 1511.

**31.** Record at 1511.

**32.** Record at 1513.

**33.** Record at 1515.

**34.** Record at 1518.

**35.** Record at 1515, 1522.

**36.** Record at 1525.

**37.** Record at 1520–21, 1524–25.

sentencing jury, he had no indication of Johnson's drug affliction, much less the totally pervasive nature of his addiction.[38] Dr. Yarbrough's affidavit reveals that, at the time of the sentencing hearing, he was not aware that Johnson was suffering from an extraordinarily severe "physical, psychological and financial dependency to a poly-drug use habit" which had developed several years earlier when Johnson began taking painkillers after having been seriously injured in a motorcycle accident.[39] Nor was he aware that Johnson regularly consumed large quantities of various narcotics simultaneously or that in the days immediately prior to the offense Johnson had obtained and been continuously consuming narcotics and other stimulants.[40]

After having been thoroughly apprised of Johnson's drug abuse and having reviewed affidavits not only from Johnson's friends and family members attesting to Johnson's history of severe drug problems, but also from Dr. Peter Macaluso, an expert addictionologist who has since conducted an extensive interview with Johnson concerning his substantial consumption of alcohol and narcotics,[41] Dr. Yarbrough now concludes that much of his testimony before the sentencing jury was erroneous.

**38.** Petition at 25; Appendix 1 (Affidavit of Dr. Ronald Yarbrough).

**39.** Petition at 122; Appendix 1 (Affidavit of Dr. Ronald Yarbrough).

**40.** *See* Petition at 123; Appendix 1 (Affidavit of Dr. Ronald Yarbrough).

**41.** On the basis of an in-person interview with Johnson, his review of affidavits from Johnson's friends and family familiar with Johnson's history and drug abuse, and his review of various other records, Dr. Macaluso detailed Johnson's history of alcohol and drug intake as follows:

"a. Mr. Johnson is the product of a chemically dependent family.

"b. Mr. Johnson had been using various mood altering and addictive drugs over the 25 years preceding his arrest in this case. By the age of 25, he was using class A drugs including marijuana, alcohol, amphetamines, speed and dexadrine along with LSD.

"c. Mr. Johnson began to use qualudes and became addicted to these as early as 1973.

"d. Although Mr. Johnson abused drugs before 1973, his severe opiod addiction began after sustaining a severe back injury in 1973. After being prescribed Demoral for a time, the prescription ran out but Mr. Johnson was still in severe pain. He then began using street Morphine and Heroin administered intravenously.

"e. Mr. Johnson subsequently became addicted to opiod narcotics administered intravenously including Demerol, Morphine, Heroin and Dilaudid. This phase of his addiction began in March 1974 and lasted until his arrest in August 1978 with the exception of one year he served in the Tennessee prison system.

"f. Mr. Johnson developed severe tolerance to IV narcotics, being able to inject several hundred-fold the normal dose of narcotic IVs which included Dilaudid, Demerol, Morphine, Percodan and Heroin.

"g. Mr. Johnson concurrently began using Cocaine and subsequently developed addiction and increased tolerance to this drug.

"h. Mr. Johnson overdosed, and/or went through withdrawal on a number of occasions, on and from intravenous Demerol.

"i. Mr. Johnson is and was a severe drug addict. His poly drug addiction is an obsessive, compulsive affliction. The obsession with drugs manifested itself in an adverse impact on his physical well-being. His difficulties included a number of automobile accidents, a number of fights with subsequent broken bones to the hands and arms, and a fractured leg, all of which were sustained under the influence of mood altering and addictive drugs.

"j. Mr. Johnson continued to use mood altering and addictive drugs in an obsessive and compulsive manner, despite or because of increasingly severe legal difficulties. He was able to sustain his destructive and self-defeating addiction by resorting to a continuous pattern of crime in order to obtain narcotics for intravenous consumption.

"k. Mr. Johnson's uncontrollable use of mood altering and addictive drugs in an obsessive and compulsive manner created psychiatric and emotional difficulties, including four marriages and the development of paranoid ideation and paranoid delusional thinking while under the influence of drugs.

"l. Mr. Johnson developed severe drug tolerance and withdrawal syndromes.

"m. Mr. Johnson continued to use in an obsessive and compulsive manner the addictive drugs Morphine, Dilaudid, Demerol, Ritalin, which were being used intravenously along with Marijuana, Cocaine and Percodan on and about the time of the offense of June 7, 1978.

"n. Hospital records verify that Mr. Johnson was an addict and suffering from withdrawal at the time of his arrest a little less than two months after the offense."

Petition at 133–35; Appendix 4 (Affidavit of Dr. Peter Macaluso).

Dr. Yarbrough's current assessment of Johnson's psychological condition at the time of the offense is radically different from his sentencing testimony. Dr. Yarbrough's evaluation of Johnson now describes an individual wholly and completely consumed with the thought of obtaining drugs.[42] Johnson's addiction, according to Dr. Yarbrough, lead to an absolute psychological obsession with drug consumption.[43] Knowing that Johnson had been regularly consuming narcotics in the days leading up to the offense and having been provided information concerning Johnson's "addiction to drugs, which was the sole motivation for the drugstore robbery that resulted in an unplanned gun battle and the victim's death," *Johnson III*, 536 So.2d at 1013 (Barkett, J., dissenting), Dr. Yarbrough now opines that Johnson "was under the influence of a totally controlling, extreme drug addiction which would have lead to his mind being totally controlled by the presence or absence of drugs."[44] In another reversal of his earlier preliminary findings as testified to the advisory jury, Dr. Yarbrough now concludes that Johnson "acted under extreme duress, when fired upon [by the victim], and as indicated from his psychological testing went into a totally emotional, irrational mode of response. At that instant, my opinion is that, due to his drug abuse and combined emotionality of the moment, Marvin's capacity to appreciate the criminality of his behavior or to conform to the requirements of the law were [sic] substantially impaired."[45]

Other affidavits offered by Johnson establish that two other experts who personally interviewed Johnson in 1988, Dr. Macaluso and Dr. Robert A. Fox, Jr., a psychiatrist, concur with Dr. Yarbrough's revised assessment. They report that until he suffered a serious back injury in 1974, Johnson had been vocally opposed to narcotic drug abuse.[46] After the injury, however, Johnson began using narcotics to ease the pain. Although initially these drugs were prescribed by his treating physician, when the prescription was discontinued, Johnson began self-administering illegal narcotics in an attempt to ease the continuing pain.[47] Unfortunately, they report, what commenced as a treatment for pain soon manifested itself as an obsessive addiction transforming Johnson into an individual "with an extraordinarily severe drug dependence personality"[48] who used drugs "in an obsessive and compulsive manner."[49]

As with Dr. Yarbrough's current assessment, many of the current conclusions offered by Drs. Fox and Macaluso stand directly contrary to Dr. Yarbrough's sentencing testimony. According to Drs. Fox and Macaluso, Johnson's physical and psychological addiction was so overwhelming that it overpowered his capacity for rational thought.[50] In their opinion, Johnson's voracious appetite for drugs together with the fact that he had consumed a large variety of addictive narcotics on the day of the offense[51] and the stress Johnson experienced when the victim began firing at him left Johnson unable to curtail his criminal actions or appreciate the nature of his actions.[52] And finally, in yet another contradiction of Dr. Yarbrough's sentencing testimony, their interviews revealed evidence that Johnson suffered from both "meta-

---

**42.** Petition at 123–24; Appendix 1 (Affidavit of Dr. Ronald Yarbrough).

**43.** *Id.*

**44.** Petition at 124; Appendix 1 (Affidavit of Dr. Ronald Yarbrough).

**45.** *Id.*

**46.** Petition at 127; Appendix 2 (Affidavit of Dr. Robert A. Fox, Jr.).

**47.** *Id.*

**48.** Petition at 129; Appendix 2 (Affidavit of Dr. Robert A. Fox, Jr.).

**49.** Petition at 134; Appendix 3 (Affidavit of Dr. Peter Macaluso).

**50.** Petition at 130, 135–36; Appendix 2 (Affidavit of Dr. Robert A. Fox, Jr.); Appendix 3 (Affidavit of Dr. Peter Macaluso).

**51.** *Id.*

**52.** Petition at 128, 130, 134, 136; Appendix 2 (Affidavit of Dr. Robert A. Fox, Jr.); Appendix 3 (Affidavit of Dr. Peter Macaluso).

bolic and chemical organic brain syndrome." [53]

The results from these more recent comprehensive psychological examinations are extremely significant. The results, if true, demonstrate that Dr. Yarbrough's preliminary conclusions as testified to in the advisory jury sentencing hearing were woefully inaccurate. More importantly, this evidence, if true, suggests the existence of three statutory mitigating factors under Florida law. *See* Fla.Stat. § 921.141(6)(b) ("The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance."); § 921.141(6)(e) ("The defendant acted under extreme duress or under the substantial domination of another person."); § 921.141(6)(f) ("The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.").

Thus, were this case before us unencumbered with concerns of procedural default, we think it is clear that the proffered evidence would support a conclusion that Johnson was prejudiced by his sentencing counsel's failure to develop and present this evidence during sentencing before the trial judge. *See Porter v. Wainwright,* 805 F.2d 930, 935–36 (11th Cir.1986), *cert. denied,* 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 682 (1987); *Stevens v. State,* 552 So.2d 1082, 1086 (Fla.1989). Here, the sentencing court in overriding the jury's recommendation of life imprisonment emphasized the fact that he found *no* mitigating circumstances to support the jury's recommendation.[54] On the basis of this factual finding, he determined that since he could adduce no facts upon which a reasonable person could suggest a sentence other than death, a jury override was appropriate. However, the evidence that Johnson has

submitted now suggests that the sentencing judge was operating under a fundamental misconception as to the existence of mitigating factors. Given these facts, we find our observations in *Porter v. Wainwright, supra,* a case involving an almost identical scenario, to be particularly *apropos:* "[I]n light of the fact that the sentencing judge viewed this case as one without mitigating circumstances when in fact, assuming [petitioner]'s allegations to be true as we must in this posture, there were mitigating circumstances which cannot be characterized as insubstantial, our confidence in the outcome—the outcome being the trial judge's decision to reject the jury recommendation—is undermined." 805 F.2d at 936 (footnote omitted). *See also Douglas v. Wainwright,* 714 F.2d 1532, 1554–58 (11th Cir.1983), *vacated,* 468 U.S. 1206, 104 S.Ct. 3575, 82 L.Ed.2d 874 (1984), *reinstated,* 739 F.2d 531 (11th Cir.1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985); *Heiney v. Dugger,* 558 So.2d 398 (Fla.1990); *Stevens v. State,* 552 So.2d at 1085–88. We conclude that there is a reasonable probability that the sentencing judge would not have overridden the jury verdict had he been presented with the evidence now proffered.[55] Indeed, we conclude that there is a high degree of certainty that the sentencing court would not have overridden the jury verdict.

Moreover, under Florida law, a trial judge may override a jury's life recommendation only when "the facts suggesting a sentence of death" are "so clear and convincing that virtually no reasonable person could differ." *Tedder v. State,* 322 So.2d at 910. Had the three statutory mitigating factors supported by Johnson's proffer been established during the sentencing hearing before the judge, we conclude that there is a reasonable probability that the Florida Supreme Court would not have per-

---

**53.** Petition at 135; Appendix 3 (Affidavit of Dr. Macaluso).

**54.** Record at 1766–70.

**55.** This conclusion satisfies the prejudice prong of the familiar two-prong test for evaluating ineffective assistance of counsel claims established in *Strickland v. Washington,* 466 U.S. 668,

104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice in this context is established by proof that there exists a reasonable probability that the result of the proceeding would have been different but for counsel's performance during the proceedings. *Id.* at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

mitted an override. Indeed, when reviewed in context of the sharp differences in opinion concerning the propriety of the sentencing judge's jury override on the existing record—i.e., *absent* consideration of the newly proffered evidence—*see Johnson II*, 523 So.2d at 161 (Barkett, J., specially concurring); *Johnson v. State*, 393 So.2d at 1074; *id.* at 1075 (Sundberg, C.J., concurring in part and dissenting in part); *id.* at 1075 (McDonald, J., dissenting), we conclude that there is a high degree of certainty that the Florida Supreme Court would not have permitted such an override had the evidence now before us been timely presented.

Without conceding the prejudice prong of the *Strickland* formula, the state at oral argument suggested that the entire inquiry is unnecessary because the decision not to develop this evidence concerning the manifestation of Johnson's drug obsession was the product of a tactical decision by Johnson's sentencing counsel. According to the state, Johnson's sentencing counsel determined that the most expedient manner in which to protect the jury's life recommendation was to do nothing that would draw the sentencing judge's attention away from the jury's verdict. The state also suggests that there was a strong tactical reason for not introducing evidence of Johnson's drug addiction: doing so would have allowed the state to introduce the details of Johnson's extensive record of violent criminal behavior exhibited in his pursuit of obtaining more and more narcotics. Johnson's attorneys, the state argues, were extremely concerned that the advisory sentencing jury would learn about Johnson's history of criminal violence. As evidence of this concern, the state points to the fact that Johnson's attorneys successfully convinced the sentencing judge to enter a motion in limine prohibiting the introduction of character evidence.[56] Additionally, the state notes that in counsel's opening statement before the jury Johnson's attorney stated that the defense had no intention of introducing character evidence in mitigation.[57]

■ If, as the state contends, the decision not to adduce the psychological evidence now at issue was the product of a reasoned tactical decision by Johnson's sentencing counsel, then the state's contention that there was no ineffective assistance of counsel is accurate. *See Sanchez v. United States*, 782 F.2d 928, 935 (11th Cir.1986) ("when a lawyer makes an informed choice between alternatives, his tactical judgment will almost never be overturned"). To prove ineffective assistance of counsel, it is not sufficient for a petitioner to establish merely that counsel's actions prejudiced the outcome of the proceedings in question; rather, the petitioner must also prove that his attorney's performance was deficient. *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. at 2064. This requires proof that the attorney's conduct, when reviewed in light of the totality of the circumstances, was "outside the wide range of professionally competent counsel." *Id.*

■ In evaluating an attorney's performance, a federal court must be careful not to judge using hindsight, but must instead review the performance from the perspective of the attorney at the time in question. *Smith v. Murray*, 477 U.S. at 536, 106 S.Ct. at 2667; *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. at 2065. Recognizing the difficulties inherent in conducting a review of the historical actions of counsel, the Supreme Court has cautioned that deficient performance of counsel should only be found when the defendant overcomes "the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. at 2065.

■ Thus, to prove that his counsel was ineffective, Johnson must submit sufficient evidence to rebut the presumption that his sentencing counsel's failure to develop the evidence he now offers was the product of "a deliberate, tactical decision" not to pursue this line of evidence at sentencing. *See Smith v. Murray*, 477 U.S. at 534, 106

---

**56.** *See* Record at 1613–16, 1680.

**57.** Record at 1639.

S.Ct. at 2666. We recognize that "while an attorney is required to conduct a 'reasonable investigation' into possible mitigating evidence, counsel may limit presentations of such evidence in the exercise of his reasonable strategic judgment." *Smith v. Dugger,* 840 F.2d 787, 795 (11th Cir.1988) (citations omitted), *cert. denied,* — U.S. ——, 110 S.Ct. 1511, 108 L.Ed.2d 647 (1990). The decision to limit an investigation as to available mitigating circumstances to be introduced during a capital sentencing hearing, however, "must flow from an *informed* judgment." *Harris v. Dugger,* 874 F.2d 756, 763 (11th Cir.) (emphasis added), *cert. denied,* — U.S. ——, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989); *Armstrong v. Dugger,* 833 F.2d 1430, 1433 (11th Cir.1987); *see Burger v. Kemp,* 483 U.S. 776, 794–796, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987). In this case, recognizing the fact that Johnson has not yet had an evidentiary hearing on this ineffective assistance claim and assuming that the evidence now proffered before us is true, *see Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 746, 9 L.Ed.2d 770 (1963); *Porter v. Wainwright,* 805 F.2d at 933, we believe Johnson has submitted sufficient evidence to support a conclusion that his sentencing counsel's failure to obtain a proper psychological investigation was not the result of a reasonable tactical decision.

Contrary to the state's suggestions, the record does not conclusively demonstrate that Johnson's attorneys' actions were the result of careful and deliberate thought. *See Blackledge v. Allison,* 431 U.S. 63, 76, 97 S.Ct. 1621, 1630, 52 L.Ed.2d 136 (1977) (petitioner's allegations are to be viewed in light of the actual record of the proceedings). Prior to the sentencing hearing before the jury, counsel indicated to the judge that their investigation into possible mitigating factors was far from complete. They requested that the judge grant a continuance so they could conduct further investigation. Given the fragmentary nature of their own investigations at that time, counsel, hoping "that there may be some information in the report that will benefit the defendant, and that information should be known to the jury—information that we do not know, and that the investigative agencies of the state would be able to learn to assist the Court and counsel for the State and counsel for the defendant,"[58] asked the judge to obtain a presentence investigation report prior to the advisory jury sentencing hearing.

They also advised the judge that additional time was necessary if they were to obtain a comprehensive diagnosis of Johnson's psychological condition. They explained that they had not obtained Dr. Yarbrough's services until the night before. In light of the expedited nature of Dr. Yarbrough's examination and in light of the fact that any testimony given by Dr. Yarbrough on the basis of his examination would consist of only preliminary findings, they asked the judge to postpone the hearing until Dr. Yarbrough could complete his psychological examination.[59]

When their requests for a continuance were denied, counsel proceeded to conduct the hearing before the sentencing jury and convinced the jury to return an advisory verdict of life imprisonment. This fact in and of itself, however, does not dictate a conclusion that counsel's investigation into Johnson's psychological condition was sufficient. *See Porter v. Wainwright,* 805 F.2d at 933–35; *Douglas v. Wainwright,* 714 F.2d at 1554–58. *See also Heiney v. Dugger,* 558 So.2d 398 (Fla.1990); *Stevens v. State,* 552 F.2d at 1085–88. At the time of the jury sentencing, counsel knew that their psychological investigation was woefully inadequate. They had approximately one month between the time of the jury sentencing hearing and the final hearing before the trial court judge in which to obtain a more detailed psychological analysis. Yet, during that one month interval, there is no indication that counsel, despite their original pleas for a continuance, sought to develop further psychological evidence.

---

**58.** Record at 1618.

**59.** Record at 1620–21.

Because we do not have the comfort of reviewing this case on the basis of a fully developed factual record, our ability to assess whether there were any reasons to justify sentencing counsel's inactivity is severely hampered. But the current record casts doubt on the state's ultimate conclusion that trial counsel's inaction was the reflection of a deliberate choice to keep the trial court's attention directed away from Johnson's record of violent criminal behavior. As an initial matter, we note that Johnson's defense team never really sought to keep Johnson's criminal record away from the jury. As early as the jury voir dire, Johnson's trial counsel asked questions concerning whether the fact that a defendant had a criminal history would affect a juror's deliberations and went so far as to intimate that Johnson had several prior convictions.[60] This fact was also acknowledged in trial counsel's opening statement.[61] Moreover, the state in its cross-examination of Johnson at trial, elicited the fact that Johnson had 10 prior convictions.[62] The state also introduced proof during the sentencing hearing that at least two of those 10 convictions were for armed robbery involving the use of violence,[63] and that Johnson had escaped from custody after one of those convictions.[64] Finally, we note that the state itself created an inference of Johnson's drug history through the testimony of Gary Summitt, the eyewitness,[65] and emphasized Johnson's familiarity with various narcotics in its closing argument during trial.[66]

Similarly, we cannot, on the record before us, attribute the fact that sentencing counsel filed a successful motion in limine prior to the jury sentencing hearing seeking to prohibit the introduction of character evidence as indicating that counsel deliberately chose to keep from the jury evidence suggesting the physiological and psychological manifestations of Johnson's drug obsession. The transcript from that hearing reveals that sentencing counsel's motivation in bringing the motion in limine was to insure that the state, in establishing statutory aggravating factors, did not attempt to circumvent existing state law and introduce evidence of an offense (i.e., an escape) for which Johnson had been accused but not yet convicted. *See* Record at 1613–1616. *See also Dougan v. State,* 470 So.2d 697, 701 (Fla.1985), *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 900 (1986); *Odom v. State,* 403 So.2d 936, 942 (Fla.1981), *cert. denied,* 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982); *Spaziano v. State,* 393 So.2d 1119, 1123 (Fla.), *cert. denied,* 454 U.S. 1037, 102 S.Ct. 581, 70 L.Ed.2d 484 (1981). Johnson's sentencing counsel did not, and indeed, in light of the fact that Johnson had already testified that he had been convicted 10 times, could not have sought to keep from the jury evidence of Johnson's prior criminal record. Indeed, the state prosecutor in his closing argument at sentencing reminded the jury that they had learned that Johnson had a history of criminal conduct. *See* Record at 1548 ("The first mitigating circumstance is that the defendant has no significant history of prior criminal activity. Certainly, that mitigating circumstance is not applicable in this case because you know that he

---

60. Record at 693, 704, 728–29, 730, 732.

61. Record at 964–65.

62. *See* Record at 1271–72.

63. *See* Record at 1474, 1480–81.

64. *See* Record at 1486–87.

65. Summitt testified that during the robbery of the pharmacy, Johnson testified to the various drugs he wanted by name, Record at 971–71, thereby creating an inference of Johnson's breadth of knowledge concerning various narcotics.

66. Record at 1399–40 ("Then we asked him [Johnson], 'Are you familiar with the names of narcotics?' And he answered that. He said, 'Yes, I am familiar with some names of narcotics.' That's about all we learned from the defendant, but that has some significance in itself. Because, remember, the robber was calling a couple names of drugs. Gary Summitt said he was saying, 'Get that stuff', and calling names which were drugs, but he didn't remember what the name of it was. That's very significant, ladies and gentlemen. We didn't learn much, but we learned a little bit. Please remember those facts, when you go back there to deliberate your verdict.").

does have a significant history of prior criminal activity").

Furthermore, and in many respects, more importantly, the state, by seeking to focus our attention on the jury's knowledge, misperceives the nature of Johnson's argument. Johnson's principal claim as we construe it concerns not so much his counsel's performance before the jury where a life imprisonment recommendation was obtained, but counsel's apparent failure to finish the psychological investigation during the one month interim before the final hearing in front of the sentencing judge. Thus, the operative inquiry here must focus on why Johnson's sentencing counsel failed to utilize that time period in a manner that would allow Dr. Yarbrough to complete his investigation and why integral information that would have assisted Dr. Yarbrough in conducting his evaluation was never provided to him.

When the inquiry is phrased in this manner, the state's suggestion that counsel made a strategic decision not to investigate and present psychological evidence becomes tenuous indeed. For example, in his arguments to the judge at sentencing, one of Johnson's sentencing counsel sought to use Johnson's drug history in mitigation.[67] Similarly, Johnson's counsel acknowledged that Johnson had a prior record and that some of his offenses were accompanied by exhibitions of violence.[68] And finally, it appears from the record that the state, in its attempt to persuade the judge to override the jury's recommendation, itself provided substantial evidence to the judge concerning the details of Johnson's criminal background.[69]

Combined with these various pieces of record evidence is the fact that the sentencing judge had presided over the entire trial and jury sentencing proceedings. The sentencing judge was fully aware that Johnson had a significant criminal record and that Johnson had committed the capital offense while attempting to obtain various narcotics. In short, reviewing the record in its present state, we see little evidence to support a tactical decision to hide from the sentencing judge Johnson's prior criminal activity.

Whether or not counsel made an informed tactical decision is a question of fact. *See Thames v. Dugger*, 848 F.2d 149, 151 (11th Cir.1988); *Messer v. State of Florida*, 834 F.2d 890, 896 (11th Cir.1987). Without the benefit of an evidentiary hearing at either the state or federal level, we cannot conclude, as a matter of law on the current record, that Johnson's counsel made a tactical decision not to conduct a complete investigation into Johnson's psychological condition. The current record supports conflicting inferences which ultimately can only be resolved through the development of a full evidentiary hearing. *See Porter v. Wainwright*, 805 F.2d at 935. Having reviewed the record and taking into account the potential impact of the evidence Johnson claims counsel failed to develop, we cannot conclude that Johnson's sentencing counsel's failure to obtain "at least one psychiatric examination and opinion *developed in a manner reasonably calculated to allow adequate review of relevant, available information*, and at such a time as [would] permit counsel reasonable opportunity to utilize the analysis

---

67. *See* Record at 1734 ("He's got a record of narcotics use and problems, and this thing was to get drugs. That could do it.").

68. Record at 1733.

69. That the sentencing judge chose not to rely upon those documents, *see* Record at 1720, does not militate against the importance of this fact. Defense counsel was obviously aware that the prosecution had submitted this additional evidence to the judge and had no way of knowing until after the judge issued his findings of fact that the judge would not be relying upon that information. Even more significantly, that defense counsel did not try to hide Johnson's prior

record from the judge is evidenced by the fact that defense counsel beseeched the judge to obtain, if not before jury sentencing then at least before final sentencing, a presentence investigation report. *See* Record at 1618 ("This is really a bifurcated request. We're saying that we want you to get a P.S.I., of course, but if Your Honor is going to order one, it would seem to me that it ought to be ordered prior to the time that the jury considers the sentencing portion.... If Your Honor elects not to do that, of course, we would ask you to order one before you make your decision.").

in preparation and conduct of the defense," *Blake v. Kemp,* 758 F.2d 523, 529 (11th Cir.) (emphasis added), *cert. denied,* 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985), was the result of conscious, reasonable thought.

Thus Johnson has alleged facts which if true would establish ineffective assistance of counsel at sentencing. However, as already discussed, he cannot establish the requisite cause to excuse his procedural default in the state collateral proceedings. Therefore, the question before us is whether the alleged factual errors and omissions are of such a magnitude that a fundamental miscarriage of justice would result were this court not to entertain the constitutional claim on the merits.

2. Johnson's Allegations Warrant an Evidentiary Hearing to Determine Whether Federal Court Intervention Is Necessary to Prevent a Fundamental Miscarriage of Justice

 Failure to establish cause for a procedural default will, in all but the most extraordinary of cases, bar federal court consideration of the merits of a petitioner's constitutional claims. However, in recognition of the fact that federal habeas corpus "is a bulwark against convictions that violate fundamental fairness," *Engle v. Isaac,* 456 U.S. at 126, 102 S.Ct. at 1571 (quotation omitted), the Supreme Court has observed that in rare instances consideration of a claim on its merits may be necessary in spite of the petitioner's failure to show cause in order to prevent a fundamental miscarriage of justice. *Murray v. Carrier,* 477 U.S. at 495–96, 106 S.Ct. at 2649. Under this exception, the procedural default doctrine will not be imposed if its application would result in the continued incarceration of an individual who may be actually innocent of the crimes for which he has been convicted. *Id.* Because Johnson's charges relate not to his conviction but rather to his sentence, a transformation of this "actual innocence" standard is necessary.

Although the Supreme Court has not explicitly stated the proper formulation of this standard in the context of addressing errors during the sentencing phase of a capital offense, it has given some indication as to the proper contours of that standard. In *Dugger v. Adams,* 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989), the issue before the Court was whether a petitioner's claim premised upon *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), was procedurally barred. Upholding the procedural bar, a majority of the *Adams* Court rejected a formulation by the dissenting justices which would have unnecessarily expanded the category of extraordinary cases in which, even absent a showing of cause and prejudice, federal intervention would be justified. A petitioner, the majority reasoned, must do more than merely argue that the alleged constitutional error *by its very nature* might have affected the accuracy of the death sentence; rather, the petitioner must demonstrate that he or she "probably is 'actually innocent' of the sentence he or she received." 489 U.S. at ——, 109 S.Ct. at 1217 n. 6.

This same view was espoused in *Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). In *Smith,* the petitioner argued that a fundamental miscarriage of justice would result were the Court not to consider the merits of his claim that testimony of a reviewing psychiatrist was improperly used against him to establish a statutory aggravating factor in support of the death penalty. The thrust of the *Smith* petitioner's claim was that statements he made to a court-appointed psychiatrist were unconstitutionally used by the state to establish that there was a likelihood that he would "constitute a continuing threat to society."

In rejecting this argument, the Court suggested an inquiry that looked to the factual basis underlying the imposition of the death sentence. The Court noted that the petitioner did not contest the veracity of the psychiatrist's testimony. Given this fact, the Court reasoned that the alleged constitutional error could be said to have "neither precluded the development of true facts nor resulted in the admission of false ones." *Id.* at 538, 106 S.Ct. at 2668. Con-

sequently, the Court determined that even if the petitioner's claim were *legally* correct, the admission of undeniably accurate facts could not be said to have "pervert[ed] the jury's deliberations concerning whether *in fact* petitioner constituted a continuing threat to society." *Id.* (emphasis in original); *cf. Kuhlmann v. Wilson,* 477 U.S. 436, 454 n. 17, 106 S.Ct. 2616, 2627 n. 17, 91 L.Ed.2d 364 (1986).

 Certain themes can be culled from *Adams* and *Smith* as to what constitutes a "fundamental miscarriage of justice" in the context of alleged constitutional errors during the sentencing stage of a capital proceeding. First, it is clear that a mere claim of constitutional error will rarely be sufficient to warrant a waiver of a procedural default. Second, a petitioner cannot prove his or her case simply by showing that the constitutional error in question is, by its very nature, one that *potentially* could have affected the decision of the sentencing body. And third, a constitutional claim that challenges only the admissibility of certain evidence without also contesting the reliability of that evidence provides insufficient grounds to excuse a procedural default. *Compare*

*Smith v. Murray,* 477 U.S. at 538, 106 S.Ct. at 2668 (no fundamental miscarriage of justice where petitioner challenges admissibility but not reliability of evidence) *with Murray v. Carrier,* 477 U.S. at 497, 106 S.Ct. at 2650 (claim that exculpatory evidence was not revealed to defendant remanded for consideration of whether failure to correct constitutional error would result in a fundamental miscarriage of justice).

 Drawing upon the foregoing Supreme Court decisions, we conclude that a petitioner, in order to establish a fundamental miscarriage of justice, must prove that as a result of the alleged constitutional error the sentencing body's deliberative process was affected to such a degree that its ultimate conclusions are probably *factually* in error.[70] In most cases, we envision that this will necessitate proof that as a result of the alleged constitutional error (1) the sentencing body was under a misperception as to the factual background of either the offender or the offense, and (2) but for those factual misperceptions held by the sentencing body, the petitioner probably would not have received a sentence of

**70.** Our holding, as stated in the text of this opinion, establishes the test for demonstrating a fundamental miscarriage of justice—i.e., that the constitutional error infected the sentencing process to such a degree that the ultimate conclusion was probably factually in error. Our decision to remand in this case does not require that we decide at this time the precise degree of certainty contemplated by the term "probably."

We recognize that two different measures of "probably" could be applied. In *Dugger v. Adams,* 489 U.S. at ——, 109 S.Ct. at 1217 n. 6, the Supreme Court phrased the inquiry as being that which looks to determine whether the petitioner "probably is 'actually innocent' of the sentence he or she received." *See also Murray v. Carrier,* 477 U.S. at 497, 106 S.Ct. at 2649 (remanding case for inquiry into whether denial of access to allegedly exculpatory material probably resulted in the conviction of an innocent person). The Court's use of the word "probably" in this context is suggestive of a "reasonable probability" legal standard, and one circuit has so held. *Stokes v. Armontrout,* 893 F.2d 152, 156 (8th Cir.1989) ("In the penalty-phase context, this exception will be available if the federal constitutional error alleged probably resulted in a verdict of death against one whom

the jury would otherwise have sentenced to life imprisonment.") (quoting *Smith v. Armontrout,* 888 F.2d 530, 545 (8th Cir.1989)). Adoption of such a standard would also appear to be consistent with the plurality's suggestion in *Kuhlmann v. Wilson,* 477 U.S. at 454 & n. 17, 106 S.Ct. at 2627 & n. 17, that a "colorable showing of innocence" may be established by looking to see whether the petitioner can prove by "a fair probability, that in light of all the evidence," the trier of fact would have reached a different outcome.

We recognize, however, that the Court's use of "probably" could also imply a different legal standard—namely, whether the petitioner can show that it is "more likely than not" that the death sentence would not have been imposed absent the constitutional violation. *Cf. Bentley v. United States,* 701 F.2d 897 (11th Cir.1983) (per curiam); *United States v. Antone,* 603 F.2d 566, 568–69 (5th Cir.1979).

At this stage of the proceedings in this case, we expressly decline to adopt either the "reasonable probability" standard or the "more likely than not" standard. We expect, on remand, that the district court will evaluate Johnson's claim under both standards and will set forth any differences that result from the application of the two standards.

death.[71]

■ Whether a petitioner can make a sufficient showing that an alleged constitutional error resulted in a sentence of death that was premised upon either false or incomplete information will, of necessity, need to be determined on an individualized basis. *See, e.g., Smith v. Murray*, 477 U.S. at 537–38, 106 S.Ct. at 2668; *Murray v. Carrier*, 477 U.S. at 497, 106 S.Ct. at 2650. In making this determination, the court will need to look to the totality of the circumstances, paying attention to both the requisite state law standards governing imposition of the death penalty and the relative strengths of the aggravating and mitigating factors found to exist. For example, under Florida law, no defendant may be sentenced to death unless the state proves the existence of one or more aggravating factors. *Banda v. State*, 536 So.2d 221, 225 (Fla.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1548, 103 L.Ed.2d 852 (1989). Thus clearly a petitioner who can establish that absent an alleged constitutional error the sentencing body probably would not have found any aggravating factors would be entitled to have federal court consideration of the claim.

■ We decline to hold, however, that a petitioner *must establish* that the constitutional error implicates *all of the existing aggravating factors* before a federal court should entertain a procedurally defaulted constitutional claim. Above all else, the overriding concern in a federal habeas corpus proceeding is whether a criminal defendant received a fundamentally fair and accurate trial and sentencing hearing. Just as it is necessary to retroactively apply new constitutional rules of criminal procedure without which the likelihood of an accurate conviction is seriously diminished, *see Saffle v. Parks*, —— U.S. at

——, 110 S.Ct. at 1263–64; *Butler v. McKellar,* —— U.S. at ——, 110 S.Ct. at 1218; *Reed v. Ross*, 468 U.S. at 14–16, 104 S.Ct. at 2909–10, so too must a claim be heard that alleges a violation of a preexisting right that significantly undermines the accuracy of a sentence which imposes a punishment "unique in its severity and irrevocability." *Gregg v. Georgia*, 428 U.S. 153, 187, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976) (Stewart, J.).

■ That a capital sentence may be inaccurate despite the existence of aggravating factors is a basic concept in eighth amendment jurisprudence. *See Hitchcock v. Dugger*, 481 U.S. at 397–99, 107 S.Ct. at 1824–25; *Skipper v. South Carolina*, 476 U.S. 1, 4–7, 106 S.Ct. 1669, 1671–72, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 113–17, 102 S.Ct. 869, 876–78, 71 L.Ed.2d 1 (1982). The reason for this is that "[i]t is critical to the reliability of a capital sentencing proceeding that the jury render an individualized decision ... focus[ing] on the 'particularized nature of the crime and the particularized characteristics of the individual defendant.'" *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir.) (quoting *Gregg v. Georgia*, 428 U.S. at 206, 96 S.Ct. at 2940), *cert. denied,* —— U.S. ——, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989). A test that would require a petitioner to establish that correction of an alleged constitutional error would probably lead to the invalidation of *all* aggravating circumstances is inconsistent with this objective of individualized sentencing.

We recognize that the opinion of Judge Cox in our recent in banc decision, *Moore v. Zant*, 885 F.2d 1497 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3255, 111 L.Ed.2d 765 (1989), could be read broadly as requiring a petitioner to establish innocence as to all aggravating circumstances. Reading the opinion in context, however,

**71.** We do not intend for this standard to be viewed as encompassing the universe of scenarios in which claims must be heard to prevent a fundamental miscarriage of justice. We can at least theoretically envision an instance in which a defendant has introduced sufficient evidence to conclusively establish that under no circumstance he or she should be given the death penalty; however, because of an erroneous instruction or some other unconstitutional factor, the deliberative body is unable to so conclude. Thus, notwithstanding the fact that the factual record is complete, the jury, given the unconstitutional error, *cannot* assess the record appropriately. Such errors, if of sufficient magnitude, would also appear to fall within the scope of the exception as discussed in *Adams* and *Smith*.

we believe that such a reading is both unnecessary and improper.

*Moore* concerned the issue of whether the "ends of justice" required federal court consideration of a *Gardner*[72] claim that the petitioner had failed to include in his first federal habeas petition. When first considered by the in banc court, the majority, recognizing that a plurality of the Supreme Court in *Kuhlmann v. Wilson* had suggested that the "ends of justice" could be satisfied only by a "colorable showing of factual innocence," 477 U.S. at 454, 106 S.Ct. at 2627, held that, at a minimum, a petitioner seeking to establish the "ends of justice" must prove that "the alleged constitutional error [either] precluded the admission of true facts [or] resulted in the admission of false ones." *Moore v. Kemp*, 824 F.2d 847, 857 (11th Cir.1987) (in banc) (quoting *Smith v. Murray*, 477 U.S. at 538, 106 S.Ct. at 2668)).[73]

After this decision was vacated by the Supreme Court, *Zant v. Moore*, 489 U.S. 836, 109 S.Ct. 1518, 103 L.Ed.2d 922 (1989),[74] the in banc court reconsidered its earlier opinion. Applying (although not adopting) the "ends of justice" standard originally set forth, a new plurality[75] of the in banc court determined that the petitioner had not made a sufficient showing to excuse his abuse of the writ:

> Under Georgia law, a defendant may be sentenced to death even if the only aggravating circumstance present is that the murder was committed during the course of an armed robbery. *See Jones*

*v. State*, 243 Ga. 820, 256 S.E.2d 907, 914 (1979). By attacking only that portion of the presentence investigation report which dealt with the accuracy of facts supporting the finding that nonstatutory aggravating factors were present, Moore has not successfully demonstrated that his sentence would not have been the same even if he prevailed on his argument regarding the nonstatutory aggravating circumstances. *See Dugger v. Adams*, 489 U.S. [401], ——, 109 S.Ct. 1211, 1217 n. 6, 103 L.Ed.2d 435 (1989). Without such proof, Moore cannot make a "colorable showing of factual innocence" of the death sentence imposed in this case, nor can he demonstrate that the error in the sentencing proceeding which he challenges affected a "material question involving the sentence."

*Moore v. Zant*, 885 F.2d at 1513.

This passage is subject to either a narrow or a broad interpretation. Read narrowly, it can be viewed as simply stating that Moore, under the particularized facts of his case, could not establish that he probably would not have received a death sentence absent the constitutional violation. On the other hand, a broad reading would suggest the establishment of a rule that a petitioner's claim does not raise a material question unless he or she contends that absent the constitutional error he or she would not fall within the pool of death-eligible defendants under state law.

Read in the context of the entire opinion, we doubt that the broad interpretation was

---

**72.** In *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Supreme Court held that a sentencing judge who imposed the death penalty based in part upon a presentence investigation report that neither the defendant nor his counsel had been permitted to review or contest violated the Eighth and Fourteenth Amendments.

**73.** As already discussed, the Supreme Court in *Smith v. Murray* suggested the language relied upon by the in banc majority in *Moore* as being appropriate to determine whether a petitioner is "probably ... actually innocent" of the sentence received.

**74.** After *Moore* was originally decided, the Supreme Court decided *Teague v. Lane,* 489 U.S.

288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The Supreme Court then vacated the opinion in *Moore* and remanded for further consideration in light of *Teague.*

**75.** This particular holding did not command a majority of the participating judges in this case. Twelve judges participated in the *Moore* decision, and only six judges concurred in the plurality opinion of Judge Cox on this issue. *See Moore v. Zant,* 885 F.2d 1497 (11th Cir.1989) (plurality opinion by Cox, J., joined by Vance, J., Tjoflat, J., and Fay, J.); *id.,* at 1518 (Edmondson, J., concurring); *id.,* at 1517 (Roney, C.J., specially concurring). Although Judge Hill concurred in the outcome, he did not believe it was necessary to reach this issue. *Id.* at 1518 (Hill, J., concurring).

intended by the plurality. It appears from reading the opinion that the plurality was concerned not with the formulation of a new threshold determination, but rather was simply stating that Moore, under the particularized facts of his case, could not establish that he probably would have received a life sentence absent the constitutional violation. For one thing, the plurality, before embarking upon its "ends of justice" discourse, had already determined that Moore's *Gardner* claim was without merit. *Id.* at 1513. Additionally, the plurality explicitly eschewed the notion that it was making any broad decisions concerning the proper standard for determining what proof was necessary to establish the "ends of justice." *Id.* Both of these facts indicate that a broad reading of the language utilized by the plurality in *Moore* would be improper.

Moreover, we deem it unlikely that the *Moore* plurality intended to adopt an interpretation inconsistent with the most reasonable construction of existing Supreme Court guidance—i.e., that the standard is whether a petitioner is probably actually innocent of the death sentence.[76] Acceptance of the broad reading of *Moore*, however, would entail a fundamental transformation of existing constitutional principles governing (1) the necessary prerequisites to be satisfied before imposition of the death penalty and (2) the accepted meaning of what constitutes being innocent of the death penalty. We discuss these additional constitutional concerns in turn.

There have been two fundamental principles which have governed the jurisprudence surrounding the imposition of capital punishment since its constitutionality was upheld in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). First, to control the arbitrary imposition of the death penalty, the state must distinguish between that class of individuals who may potentially be put to death and those who may not. Accomplishment of this objective requires the enactment of clear, consistent guidelines, *Proffitt v. Florida*, 428 U.S. 242, 254–56, 96 S.Ct. 2960, 2967–68, 49 L.Ed.2d 913 (1976); *compare Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 1858–60, 100 L.Ed.2d 372 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 428–29, 433, 100 S.Ct. 1759, 1763–64, 1767, 64 L.Ed.2d 398 (1980), that "must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983)).

A state does not fulfill its constitutional obligations, however, by merely limiting the class of individuals who may be sentenced to death. In other words, a state may not simply mandate that all individuals who are death-eligible may be put to death. *Sumner v. Shuman*, 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987); *Roberts (Harry) v. Louisiana*, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977); *Roberts*

---

**76.** In any event, because only 6 of the participating 12 judges concurred in the abuse of the writ discussion, *see supra,* note 75, the decision rendered on the "ends of justice" issue is not binding precedent. The breakdown of the participating judges in *Moore* is directly analogous to the situation presented by the Supreme Court's decision in *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). Eight justices participated in *Watson*. Four justices proposed a fundamental shift in the placement of the burdens of proof in a case involving disparate impact. *Id.* at 993–1000, 108 S.Ct. at 2788–91 (O'Connor, J., joined by Rehnquist, C.J., White, J., and Scalia, J.). Although three justices took exception to this proposed shift, *id.* at 1005–11, 108 S.Ct. at 2795–97 (Black-

mun, J., concurring in part and concurring in the judgment, joined by Brennan, J., and Marshall, J.), the final participating justice saw no occasion to reach the issue of burdens of proof in that particular case. *Id.* at 1011, 108 S.Ct. at 2797 (Stevens, J., concurring in the judgment).

Given this circumstance, two different panels of this court held that the *Watson* plurality was not binding. *See Foster v. Bd. of School Commissioners*, 872 F.2d 1563, 1562 n. 8 (11th Cir. 1989) ("A plurality opinion is not binding on this Court and we are compelled to follow both our precedent as well as prior Supreme Court precedent") (citations omitted); *Powers v. Alabama Dep't of Educ.*, 854 F.2d 1285, 1292 n. 11 (11th Cir.1988) (same), *cert. denied,* —— U.S. ——, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989).

*(Stanislaus) v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Such an action runs counter to the second fundamental principle: namely, that the sentencing body must be permitted to consider and give effect to all mitigating circumstances surrounding the individual offender. *See Penry v. Lynaugh*, — U.S. —, 109 S.Ct. 2934, 2951–52, 106 L.Ed.2d 256 (1989); *Hitchcock v. Dugger*, 481 U.S. at 397–399, 107 S.Ct. at 1824; *Skipper v. South Carolina*, 476 U.S. at 4–8, 106 S.Ct. at 1670–73; *Eddings v. Oklahoma*, 455 U.S. at 110, 102 S.Ct. at 874. Thus notwithstanding the fact that an individual may fall within the pool of death-eligible defendants, a state must provide a mechanism by which the sentencer can make an individualized assessment of the appropriateness of the death penalty. To do otherwise in a capital case would be inconsistent with "the fundamental respect for humanity underlying the Eighth Amendment ... [which] requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Sumner v. Shuman*, 483 U.S. at 75, 107 S.Ct. at 2722 (quoting *Woodson v. North Carolina*, 428 U.S. at 304, 96 S.Ct. at 2991).

A comparison between *Sumner v. Shuman, supra*, and *Blystone v. Pennsylvania*, — U.S. —, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), crystallizes this last point. In *Shuman*, the Supreme Court rejected a Nevada statute that would have required mandatory imposition of the death penalty for an inmate who commits murder while serving a sentence of life imprisonment. The fatal flaw in such a statute, the Court reasoned, was that "[a] process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." 483 U.S. at

74, 107 S.Ct. at 2722 (quoting *Woodson v. North Carolina*, 428 U.S. at 304, 96 S.Ct. at 2991).

In *Blystone*, the Court was confronted with what, on a superficial level, appeared to be a requirement mandating death in certain circumstances. The issue to be addressed in *Blystone* was whether a statute which provided that "[t]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance ... and no mitigating circumstance" was constitutionally permissible. In marked contrast to the situation in *Shuman*, however, this statute provided for the consideration of all relevant mitigating factors prior to the determination of the appropriate sentence. This fact, the Court concluded, was sufficient to distinguish the statute invalidated in *Shuman* from the Pennsylvania statute before it in *Blystone*. — U.S. at — – —, 110 S.Ct. at 1083–84 & n. 5.

The differences between the resolutions of *Shuman* and *Blystone* establish that it is not sufficient under the constitution to impose death because a given defendant meets the eligibility criteria for imposition of that sentence. Unless the sentencing body is free to consider and give effect to the full range of mitigating circumstances offered by the defendant, imposition of the death penalty remains impermissible. "[F]ull consideration of evidence that mitigates against the death penalty is essential if the [sentencing body] is to give a reasoned *moral* response to the defendant's background, character, and crime." *Penry v. Lynaugh*, — U.S. at —, 109 S.Ct. at 2951 (quotation omitted) (emphasis in original).

Thus, regardless of whether the state limits the pool of defendants eligible to receive the imposition of death through its definition of a capital offense or through aggravating circumstances, consideration of the character and record of the individual offender and the circumstances of the particular offense are a "constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. at 304, 96 S.Ct.

at 2991; *see Lowenfield v. Phelps*, 484 U.S. at 245–47, 108 S.Ct. at 555 (distinguishing between the manner in which the state narrows the class of death-eligible persons and the manner in which the state selects from the class of death eligible persons). We conclude that the broad reading of the plurality opinion in *Moore* would be inconsistent with this constitutional requirement.

The second problem with a broad reading of the plurality opinion in *Moore* is that such an interpretation would transform the accepted meaning of being innocent of the death penalty. By suggesting that a petitioner must make a showing of innocence of all aggravating circumstances, the broad reading fails to distinguish between the concepts of "death eligibility" and "innocent of the death penalty"—the latter being the required showing necessary to establish the fundamental miscarriage of justice exception. As defined by both the Supreme Court and our own circuit, a defendant is generally considered "innocent of the death penalty" when the sentencing body, confronted with one of two alternatives, life imprisonment or death, chooses a life sentence. *See Poland v. Arizona*, 476 U.S. 147, 155–56, 106 S.Ct. 1749, 1755, 90 L.Ed.2d 123 (1986); *Arizona v. Rumsey*, 467 U.S. 203, 210–12, 104 S.Ct. 2305, 2310, 81 L.Ed.2d 164 (1984); *Bullington v. Missouri*, 451 U.S. 430, 444–46, 101 S.Ct. 1852, 1861–62, 68 L.Ed.2d 270 (1981); *Godfrey v. Kemp*, 836 F.2d 1557, 1568 (11th Cir.), *cert. dismissed*, 487 U.S. 1264, 109 S.Ct. 27, 101 L.Ed.2d 977 (1988); *see also Young v. Kemp*, 760 F.2d 1097, 1106–07 and n. 12 (11th Cir.1985), *cert. denied*, 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986). An

"initial sentence of life imprisonment [is] undoubtedly an acquittal on the merits of the central issue in the proceeding—whether death was the appropriate punishment for the respondent's offense." *Arizona v. Rumsey*, 467 U.S. at 211, 104 S.Ct. at 2310. A return of a sentence of life imprisonment by the final sentencing body or a reviewing court denotes "that the prosecution has not proved its case *that the death sentence is appropriate.*" *Poland v. Arizona*, 476 U.S. at 155, 106 S.Ct. at 1755 (emphasis in original) (quotation and footnote omitted); *see Godfrey v. Kemp*, 836 F.2d at 1568 ("if the initial sentencer imposes a life sentence the defendant is 'acquitted' of death"). In other words, a person is innocent of the death penalty when the sentencing body has rejected the death sentence and imposed a life sentence; it is not necessary to establish that one is innocent of all aggravating circumstances. *See Poland v. Arizona*, 476 U.S. at 156, 106 S.Ct. at 1755 ("the judge's finding of any particular aggravating circumstance does not of itself 'convict' a defendant (i.e., require the death penalty)").

Under the broad reading of *Moore*, a petitioner cannot make a showing of innocence of the death penalty without proving that, absent the constitutional error, no aggravating factors would exist. This interpretation, however, goes well beyond the requirement that a petitioner show that he or she *"probably* is 'actually innocent' of the sentence he or she received," *Dugger v. Adams*, 489 U.S. at ——, 109 S.Ct. at 1217–18 n. 6 (emphasis added); it would require that the petitioner show he or she is not death-eligible.[77]

---

77. To the extent that the Supreme Court's invocation of "actual innocence" in this context can be traced to Judge Friendly's views as expressed in his article, Friendly, *Is Justice Irrelevant?, Collateral Attack on Criminal Judgments*, 38 U.Chi.L.Rev. 142, 146–58 (1970), *cf. Kuhlmann v. Wilson*, 477 U.S. at 454, 106 S.Ct. at 2627, we note that the broad reading in *Moore* does not comport with Judge Friendly's interpretation of this standard. Application of the broad reading in *Moore* to the guilt/innocence stage would suggest that a petitioner could not establish factual innocence unless he or she can conclusively demonstrate no involvement in the offense. Judge Friendly, on the other hand, adopted a more expansive notion of the proof necessary to raise a sufficient question of factual innocence: under his approach, the prisoner need only establish that there exists "a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial, the trier of facts would have entertained a reasonable doubt of his guilt." Friendly, *supra*, at 160 (footnote omitted), *quoted in Kuhlmann v. Wilson*, 477 U.S. at 454 n. 17, 106 S.Ct. at 2627 n. 17.

Because adoption of the broad reading in *Moore* would be inconsistent with the clear constitutional requirement that the sentencing body be allowed to consider and give effect to all mitigating evidence prior to imposing sentence, and because it would contravene the common understanding of what "innocent of the death penalty" entails, we decline to adopt that interpretation here.[78] Instead, we believe that in order to establish that a fundamental miscarriage of justice resulted in the imposition of a death sentence, a petitioner must generally be able to establish that the alleged constitutional error substantially "undermin[ed] the accuracy of

Similarly, the dissent's suggestion that a petitioner cannot establish probable actual innocence of the sentence received unless the petitioner can prove that he or she is not eligible to receive the death penalty is significantly more restrictive than that suggested by either the Supreme Court or Judge Friendly. According to the dissent, a petitioner cannot show that he or she is probably "actually innocent" of the death penalty if "despite the alleged error, a reasonable sentencing body *could* impose death as a punishment for the crime committed." *Post*, at 491–492 (emphasis in original). The relationship of this eligibility test to the Supreme Court's requirement of probable actual innocence is at best attenuated. For example, if the rationale of the dissent were applied to the guilt phase, the appropriate inquiry would be whether despite the alleged error, a reasonable jury *could* convict. Under such an inquiry, the fundamental miscarriage of justice standard could be met perhaps only by a petitioner who could demonstrate that the petitioner's status, e.g., minority, rendered the petitioner ineligible to be convicted. Perhaps the dissent's standard could also be met in the guilt phase by satisfying the standard found in *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560 (1979), namely, only "if it is found that … no rational trier of fact could have found proof of guilt beyond a reasonable doubt." We are confident that the standard suggested by the dissent is misplaced. The restrictive status standard, i.e., eligibility to be convicted or sentenced, is clearly at odds with the manner in which the phrase has been used both by the Supreme Court and by Judge Friendly. The *Jackson v. Virginia* standard is used to evaluate a claim of innocence, and not a claim of *probable* actual innocence.

**78.** Additionally, imposition of such a requirement is wholly inconsistent with Florida law. Under Florida law, the existence of one or more aggravating factors does not, in and of itself, mandate the imposition of the death penalty. Indeed, particularly in cases involving a jury override such as the one before us, the Supreme Court of Florida, even in cases having one or more valid statutory aggravating factors, has shown no reluctance to reverse a death sentence and order life imprisonment in lieu thereof.

Although not necessarily exhaustive, the following is a list of Florida cases in which aggravating factors either existed or were assumed to exist and the Florida Supreme Court reversed a judge's override of a jury life recommendation and required imposition of a life sentence:

*Five valid aggravating factors: Ferry v. State*, 507 So.2d 1373 (Fla.1987).

*Four valid aggravating factors: Masterson v. State*, 516 So.2d 256 (Fla.1987); *Brookings v. State*, 495 So.2d 135 (Fla.1986); *Amazon v. State*, 487 So.2d 8 (Fla.), *cert. denied*, 479 U.S. 914, 107 S.Ct. 314, 93 L.Ed.2d 288 (1986); *Richardson v. State*, 437 So.2d 1091 (Fla.1983); *Hawkins v. State*, 436 So.2d 44 (Fla.1983); *Gilvin v. State*, 418 So.2d 996 (Fla.1982); *Welty v. State*, 402 So.2d 1159 (Fla.1981).

*Three valid aggravating factors: Christian v. State*, 550 So.2d 450 (Fla.1989), *cert. denied,* ── U.S. ──, 110 S.Ct. 1475, 108 L.Ed.2d 612 (1990); *Fuente v. State*, 549 So.2d 652 (Fla. 1989); *Freeman v. State*, 547 So.2d 125 (Fla. 1989); *Cochran v. State*, 547 So.2d 928 (Fla. 1989); *Pentecost v. State*, 545 So.2d 861 (Fla. 1989); *Harmon v. State*, 527 So.2d 182 (Fla. 1988); *Brown v. State*, 526 So.2d 903 (Fla.1988); *Holsworth v. State*, 522 So.2d 348 (Fla.1988); *Burch v. State*, 522 So.2d 810 (Fla.1988); *DuBoise v. State*, 520 So.2d 260 (Fla.1988); *Wasko v. State*, 505 So.2d 1314 (Fla.1987); *Walsh v. State*, 418 So.2d 1000 (Fla.1982); *Neary v. State*, 384 So.2d 881 (Fla.1980); *Jones v. State*, 332 So.2d 615 (Fla.1976).

*Two valid aggravating factors: Spivey v. State*, 529 So.2d 1088 (Fla.1988); *Caillier v. State*, 523 So.2d 158 (Fla.1988); *Perry v. State*, 522 So.2d 817 (Fla.1988); *Fead v. State*, 512 So.2d 176 (Fla.1987); *Barclay v. State*, 470 So.2d 691 (Fla. 1985); *Rivers v. State*, 458 So.2d 762 (Fla.1984); *Thompson v. State*, 456 So.2d 444 (Fla.1984); *Washington v. State*, 432 So.2d 44 (Fla.1983); *Cannady v. State*, 427 So.2d 723 (Fla.1983); *Stokes v. State*, 403 So.2d 377 (Fla.1981); *Jacobs v. State*, 396 So.2d 713 (Fla.1981); *Brown v. State*, 367 So.2d 616 (Fla.1979); *McCaskill v. State*, 344 So.2d 1276 (Fla.1977); *Burch v. State*, 343 So.2d 831 (Fla.1977); *Tedder v. State*, 322 So.2d 908 (Fla.1975).

*One valid aggravating factor: Huddleston v. State*, 475 So.2d 204 (Fla.1985); *Herzog v. State*, 439 So.2d 1372 (Fla.1983); *McKennon v. State*, 403 So.2d 389 (Fla.1981); *Barfield v. State*, 402 So.2d 377 (Fla.1981); *Phippen v. State*, 389 So.2d 991 (Fla.1980); *Williams v. State*, 386 So.2d 538 (Fla.1980); *Shue v. State*, 366 So.2d 387 (Fla.1978); *Buckrem v. State*, 355 So.2d 111 (Fla.1978); *Chambers v. State*, 339 So.2d 204 (Fla.1976); *Provence v. State*, 337 So.2d 783 (Fla.1976), *cert. denied*, 469 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977).

the ... sentencing determination" either by precluding the development and consideration of true facts or by resulting in the admission of false ones. *Smith v. Murray,* 477 U.S. at 538–39, 106 S.Ct. at 2668. Under this standard, it is not sufficient to prove merely that the constitutional error precluded the development or consideration of *any* true facts; rather, the newly developed facts must be relevant to the factual issues to be resolved by the sentencing body—for only those facts have the potential for "pervert[ing] the [sentencing body]'s deliberations" or "undermining the accuracy of the ... sentencing determination." *Id.* In addition, the new factual developments resulting from the correction of the alleged constitutional error must be of such importance that an individual petitioner can establish that he or she *"probably* is 'actually innocent' of the sentence he or she received"—that is, that absent the constitutional error the petitioner probably would not have received the death sentence.[79] *Dugger v. Adams,* 489 U.S. at ——, 109 S.Ct. at 1217–18 n. 6 (emphasis added).

■ Applying this standard here, we conclude that an evidentiary hearing is necessary to prevent a potential miscarriage of justice. According to Johnson, sentencing counsel's failure to conduct a comprehensive investigation into Johnson's psychological well-being had two substantially deleterious effects: the introduction of materially false evidence and the omission of materially accurate evidence. Assuming that Johnson's proffered facts are true, there is ample support for this contention. Dr. Yarbrough, testifying on the basis of a hurried compilation of results from brief diagnostic tests administered the night before the hearing, stated that Johnson exhibited no signs of being out of touch with reality or of having organic brain damage. Additionally, Dr. Yarbrough opined that there was no evidence to suggest that Johnson lacked the capacity to appreciate the criminality of his conduct. This testimony effectively withdrew two statutory mitigating factors from consideration. *See* Fla.Stat. § 921.141(6)(b) ("The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance."); § 921.141(6)(f) ("The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.").

At the time these findings were introduced into testimony at the jury sentencing hearing, Johnson's counsel, by their own admissions, were aware that Dr. Yarbrough's testimony consisted of, at best, preliminary assessments. Sentencing counsel was also clearly conscious of the fact that significantly more psychological testing was necessary. However, they did not utilize the full one-month interval between sentencing hearings to develop an adequate psychological profile. Had they done so, they would have learned—assuming the proffered evidence is true as Dr. Yarbrough now concedes—that many of

---

79. Contrary to the dissent's suggestion, the standard that we enunciate here is not simply a restatement of the traditional prejudice test used to evaluate ineffective assistance of counsel claims found in *Strickland v. Washington, supra.* Under *Strickland,* a petitioner can prove ineffective assistance of counsel by, *inter alia,* showing that counsel's errors led to the admission of evidence obtained in violation of defendant's constitutional rights and that absent the admission of this unconstitutionally obtained evidence, there is a reasonable probability that the outcome of the proceedings would have been different. In contrast, at this stage of the proceedings, a federal habeas court is required to consider *all* reliable, probative evidence in assessing whether the petitioner would have received the death sentence absent the alleged constitutional error. Thus, here, the federal habeas court would continue to consider unconstitutionally obtained evidence—so long as its reliability has not been called into question—when making its determination as to whether, given all the factual circumstances and pursuant to the applicable legal standards, the petitioner probably would not have received the death sentence absent the alleged constitutional error.

A further potential difference between *Strickland* and the inquiry here can be traced to the applicable standard to be invoked when evaluating the petitioner's proof. *Strickland* requires a showing that there exists a "reasonable probability" that the result would be different absent the alleged constitutional error; we have expressly *declined to decide whether this same* standard or a higher standard is necessary when evaluating a claim that has been inexcusably procedurally defaulted. *See* note 70, *supra.*

the initial, preliminary psychological indications were grossly in error. A completed psychological evaluation would have revealed that Johnson had a twenty-five year history of sustained drug abuse and that he was obsessed in his pursuit to obtain and consume drugs. According to all of the expert evidence submitted, this obsession, particularly when viewed in light of the large quantities of drugs consumed by Johnson in the days immediately surrounding the instant crime, left Johnson wholly dominated by his drug addiction. Had a complete psychological investigation been conducted, evidence that Johnson was unable to appreciate the criminality of his behavior would have been established as would evidence that Johnson was the victim of physiological brain disorders. These facts, in marked contrast to the Dr. Yarbrough's sentencing testimony, very well could have supported a finding that both Fla.Stat. § 921.141(6)(b) and Fla.Stat. § 921.141(6)(f) were present in this case. Similarly, as evidenced by his current findings, Dr. Yarbrough's testimony concerning Johnson's susceptibility to react irrationally when placed under stress would have been substantially more probative had Yarbrough been aware of Johnson's narcotics obsession and that Johnson had consumed significant amounts of drugs in the days immediately prior to the offense. Indeed, Dr. Yarbrough now concludes that Johnson was suffering from extreme duress as contemplated by the statutory mitigating circumstances of Fla.Stat. § 921.141(6)(e). This evidence would have been particularly compelling in light of the undisputed fact that Johnson was exiting the store without harm to anyone when the victim initiated the deadly gun battle. *Johnson III*, 536 So.2d at 1013 (Barkett, J., dissenting).

Although the potential impact of new evidence may sometimes be a somewhat difficult task to predict, the significance of the evidence in this case cannot be underestimated. It must not be forgotten that this case arises within the context of a judicial decision to override the sentencing jury's life imprisonment recommendation. Such judicial overrides are permissible under Florida law in only very limited circumstances. Notwithstanding the sentencing jury's "advisory" label, its recommendation, inasmuch as it reflects the conscience of the community, is entitled to great weight. *Holsworth v. State*, 522 So.2d 348, 354 (Fla.1988); *Richardson v. State*, 437 So.2d 1091, 1095 (Fla.1983). When a jury recommends life imprisonment, as it did in this case, a sentencing judge may not impose death simply because he or she disagrees the jury's interpretation of the evidence or with the manner in which the jury weighed the evidence. *Holsworth*, 522 So.2d at 354; *Valle v. State*, 502 So.2d 1225, 1226 (Fla.1987); *Chambers v. State*, 339 So.2d 204, 208 (Fla.1976) (England, J., concurring). Instead, the sentencing judge is only permitted to override the jury's recommendation of life in cases in which it is determined that the facts suggesting death were so clear and convincing that virtually no reasonable person could differ. *Tedder v. State*, 322 So.2d 908, 910 (Fla. 1975). Should a reasonable basis in fact exist which would support the jury's recommended sentence, then a judicial decision to override that recommendation will be vacated. *See, e.g., Freeman v. State*, 547 So.2d 125, 129 (Fla.1989); *Brown v. State*, 526 So.2d 903, 907–08 (Fla.), *cert. denied*, 488 U.S. 944, 109 S.Ct. 371, 102 L.Ed.2d 361 (1988); *Hawkins v. State*, 436 So.2d 44, 47 (Fla.1983); *Webb v. State*, 433 So.2d 496, 499 (Fla.1983); *Barfield v. State*, 402 So.2d 377, 382 (Fla.1981); *Jacobs v. State*, 396 So.2d 713, 717 (Fla.1981); *Brown v. State*, 367 So.2d 616, 625 (Fla.1979); *Provence v. State*, 337 So.2d 783, 787 (Fla.1976), *cert. denied*, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). *See generally Mann v. Dugger*, 844 F.2d 1446, 1451 (11th Cir. 1988) (collecting additional cases), *cert. denied*, —— U.S. ——, 109 S.Ct. 1353, 103 L.Ed.2d 821 (1989).

In this case, the sentencing judge in overriding the jury's recommendation placed great weight upon the fact that there were no facts in mitigation to support a sentence of life imprisonment. Record at 1766. In spite of this finding that there were no reasonable grounds for mitigation

in the record, his decision to override the jury's recommendation sparked sharp controversy in the Florida Supreme Court and was upheld by a bare one-vote margin. *See Johnson v. State*, 393 So.2d at 1074 (Sundberg, C.J., concurring in part and dissenting in part); *id.* at 1075 (McDonald, J., dissenting). Now it appears that sentencing counsel failed to develop evidence material to petitioner's psychological state at the time of the crime. Additionally, although petitioner had a clear history of drug abuse and petitioner's addiction to drugs appeared to have been the sole motivation for the drugstore robbery, no evidence concerning his drug addiction was developed. Given that five different justices of the Florida Supreme Court—including four who are currently sitting on that court—have at various times questioned the appropriateness of the original override in this case, there can be little question that the introduction of evidence suggesting petitioner's prolonged addiction to drugs and the psychological and physical pathologies arising from his sustained drug abuse would likely have provided more than ample reasonable grounds to prevent the judicial override in this case. *See, e.g., Holsworth v. State*, 522 So.2d at 354 (override improper where defendant had drug and alcohol problem and may have been high on PCP and alcohol at time of the murder); *Masterson v. State*, 516 So.2d 256, 258 (Fla.1987) (evidence that defendant had substantial drug and alcohol problem dating back to service in Vietnam and that defendant consumed substantial amounts of drugs and alcohol on the day of the murder was sufficient mitigating evidence to preclude jury override); *Fead v. State*, 512 So.2d 176, 178 (Fla.1987) (defendant was intoxicated); *Cannady v. State*, 427 So.2d 723, 731 (Fla.1983) (jury had reasonable basis for recommending life imprisonment in light of testimony concerning the psychological effects caused by defendant's history of indiscriminate drug abuse). *See also Burch v. State*, 522 So.2d 810, 813 (Fla.1988); *Amazon v. State*, 487 So.2d 8, 13 (Fla.), *cert. denied*, 479 U.S. 914, 107 S.Ct. 314, 93 L.Ed.2d 288 (1986); *Huddleston v. State*, 475 So.2d 204, 206 (Fla.1985);

*Norris v. State*, 429 So.2d 688, 690 (Fla. 1983). If the proffered evidence establishing three statutory mitigating circumstances is true, we conclude that there is a high degree of certainty that the sentencing judge, who had relied on the erroneous assumption that there were no mitigating circumstances, would not have overridden the jury's verdict. Similarly, we conclude that there is a high degree of certainty that the Florida Supreme Court would not have permitted an override under such circumstances.

Accordingly, looking to the totality of the circumstances in this case—including, *inter alia,* the probative value of the proffered evidence in light of the facts developed at trial and sentencing and in light of the posture of the case involving a jury override—we conclude that Johnson has proffered evidence which if true would establish that he probably was actually innocent of the death sentence. As a result, we conclude that it is necessary to remand this claim to the district court for consideration as to whether relief is necessary notwithstanding the existing procedural default. *See Murray v. Carrier*, 477 U.S. at 497, 106 S.Ct. at 2650; *Ewing v. McMackin*, 799 F.2d 1143, 1152 (6th Cir.1986).

### D. *Does Johnson's Claim Constitute an Abuse of the Writ?*

The state contends that neither a remand nor an evidentiary hearing is necessary because this claim is also due to be dismissed because it constitutes an abuse of the writ. *See* Rule 9(b), Rules Governing Section 2254 cases. The district court determined that it did not need to address this defense because it viewed Johnson's claim as being procedurally barred. Given our resolution of the procedural bar issue, this rationale is no longer appropriate. Nonetheless, we conclude for reasons similar to those motivating our remand of the procedural default issue that it is proper for the district court to evaluate the state's defense in the first instance.

### 1. Abuse of the Writ

Johnson did not raise this claim in his first federal habeas petition. Consequent-

ly, to justify federal court consideration of his ineffective assistance of counsel claim, he must first prove that there exists sufficient grounds to justify federal court consideration of this claim.

"A petition that raises grounds for relief not raised in the prior petition is analyzed as an 'abuse of the writ.'" *Gunn v. Newsome*, 881 F.2d 949, 955 n. 6 (11th Cir.) (in banc) (plurality opinion), *cert. denied,* —— U.S. ——, 110 S.Ct. 542, 107 L.Ed.2d 540 (1989); *see, e.g., Richardson v. Thigpen*, 883 F.2d 895, 899 (11th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 110 S.Ct. 17, 106 L.Ed.2d 631 (1989). When a petitioner attempts to litigate a different claim in a subsequent federal petition, federal courts run the risk of being subjected to "needless piecemeal litigation" or "collateral proceedings whose only purpose is to vex, harass, or delay." *Sanders v. United States*, 373 U.S. 1, 18, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963). To control these problems, Congress and the courts have taken various steps to limit the circumstances in which new claims raised in subsequent federal petitions will be heard. *See* 28 U.S.C. § 2244(b); Rule 9(b) of the Federal Rules Governing Section 2254 Cases in the United States District Courts; *see generally Potts v. Zant*, 638 F.2d 727, 738–40 (5th Cir. Unit B), *cert. denied,* 454 U.S. 877, 102 S.Ct. 357, 70 L.Ed.2d 187 (1981).

■ Whether a petition should be dismissed for an abuse of the writ is within the discretion of the district court. *Sanders v. United States*, 373 U.S. at 18, 83 S.Ct. at 1079; *Gunn*, 881 F.2d at 957. The government bears the initial burden of raising the abuse of the writ issue. *Price v. Johnston*, 334 U.S. 266, 291–92, 68 S.Ct. 1049, 1063, 92 L.Ed. 1356 (1948). Once the government satisfies its burden of pleading abuse of the writ, the burden of proving that there has been no abuse shifts to the petitioner. *Id.* at 291–92, 68 S.Ct. at 1063. To meet this burden, the petitioner must prove by a preponderance of the evidence

that he or she had some "justifiable reason" for omitting the claim in an earlier petition, *Fleming v. Kemp*, 837 F.2d 940, 950 (11th Cir.1988) (per curiam), *cert. denied sub nom. Fleming v. Zant,* —— U.S. ——, 109 S.Ct. 1764, 104 L.Ed.2d 200 (1989), and that the failure to include the new claim in the prior federal proceeding cannot be attributed to intentional abandonment or withholding, or inexcusable neglect. *See McCleskey v. Zant*, 890 F.2d 342, 347 (11th Cir.1989), *cert. granted,* —— U.S. ——, 110 S.Ct. 2585, 110 L.Ed.2d 266 (1990); *Demps v. Dugger*, 874 F.2d at 1391; *Witt v. Wainwright*, 755 F.2d 1396, 1397 (11th Cir.), *cert. denied,* 470 U.S. 1039, 105 S.Ct. 1415, 84 L.Ed.2d 801 (1985).

■ Several means exist by which a petitioner may seek to satisfy this burden. For example, he or she can seek to show that there is newly discovered evidence that was not available at the time of his original filing or that there has been a retroactive change in the law. *Demps v. Dugger*, 874 F.2d at 1392. Additionally, even if the petitioner cannot convince the district court that there was no abuse of the writ, he or she may still be able to obtain federal court review by establishing that the "ends of justice" so require. *Sanders v. United States*, 373 U.S. at 18–19, 83 S.Ct. at 1079; *see Moore v. Zant*, 885 F.2d at 1508.

2. Further Proceedings Are Necessary to Determine Whether the "Ends of Justice" Require Consideration of Johnson's Claim

Although Johnson offers several arguments in support of his contention that federal court consideration of his ineffective assistance of sentencing counsel claim is required, we need not address these arguments because it appears, in any event, that a factual determination is necessary to evaluate whether the "ends of justice" require consideration of the claim.[80]

---

**80.** Johnson's claim that the abuse of the writ was excused by *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), need not be addressed on remand. We conclude that his reliance on *Ake* is misplaced. We have inter-

preted *Ake*'s holding as affirming a defendant's constitutional right to receive competent psychiatric assistance upon proof that the defendant has a substantial, demonstrated need for such assistance. *See Messer v. Kemp,* 831 F.2d at 960;

As with the "fundamental miscarriage exception" to the procedural default doctrine, a working definition of what constitutes the "ends of justice" is one over which there is considerable controversy. In *Kuhlmann v. Wilson,* a plurality of the Supreme Court wrote that the ends of justice require federal courts to entertain successive petitions "only where the prisoner supplements his constitutional claim with a colorable showing of factual innocence." 477 U.S. at 454, 106 S.Ct. at 2627 (plurality opinion). This viewpoint, however, did not command a majority of the court; consequently, this circuit has interpreted *Kuhlmann* as having not limited the "ends of justice" inquiry to only a "colorable showing of factual innocence." *Martin v. Dugger,* 891 F.2d 807, 809 (11th Cir.1989). Instead, looking back to the various equitable considerations suggested by the Supreme Court in *Sanders v. United States,* 373 U.S. at 17, 83 S.Ct. at 1078, we have advised district courts to exercise their discretion to determine whether the "ends of justice" mandate federal habeas relief to correct a constitutional violation. *Martin v. Dugger,* 891 F.2d at 809–10.

 Thus, one, but not the exclusive, means by which a petitioner with a constitutional claim relating to the sentencing phase of a capital trial can satisfy the "ends of justice" requirement is by making a colorable showing that he or she would have been found innocent of the death penalty absent the constitutional violation. To assess whether a petitioner has made a sufficient showing via this alternative, this circuit has adopted a test similar to that utilized in assessing whether a procedural default should be excused: "we must consider whether 'the alleged constitutional error [either] precluded the development of

true facts [or] resulted in the admission of false ones.'" *Tafero v. Dugger,* 873 F.2d 249, 251 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1834, 108 L.Ed.2d 962 (1990); *Ritter v. Thigpen,* 828 F.2d 662, 666 (11th Cir.1987). This standard is premised upon the same considerations that underlie the "fundamental miscarriage of justice" exception to the procedural default doctrine discussed earlier, and is substantively virtually identical. Because, as explained in Section V.C.2, *supra,* an evidentiary hearing is necessary to assess the petitioner's proffered allegations and factual evidence in light of this same standard, we conclude that a remand on this issue is also necessary.

## VI. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL: BALLISTICS

 In his final claim, Johnson argues that his trial counsel was ineffective for failing to adequately investigate the scene of the crime and for not obtaining expert assistance to rebut the State's ballistic evidence. Like his ineffective assistance of counsel at sentencing claim, Johnson failed to comply with the time limitations governing Rule 3.850 proceedings in Florida. Accordingly, the Florida Supreme Court declined to address this claim on the merits. *Johnson III, supra.*

This holding constitutes an independent and adequate state ground. *Whiddon v. Dugger,* 894 F.2d at 1267–68. Consequently, we will review this claim on the merits only if Johnson can establish cause and prejudice or if Johnson can show that federal review is necessary to prevent a miscarriage of justice.

Under the facts of this case, it is clear that Johnson suffered no prejudice by counsel's failure to timely raise this claim

---

*Moore v. Kemp,* 809 F.2d 702, 712 (11th Cir.) (in banc), *cert. denied,* 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987). Johnson's claim of ineffectiveness, however, is not that he was denied access to a psychiatrist, but rather that the scope of the psychiatric examination he received was not sufficient because counsel failed to inform his psychiatrist of all relevant facts and because counsel failed to have the psychiatrist conduct a more complete investigation during the one month interval between the advisory

sentencing proceedings and the sentencing before the judge. This claim is an ineffective assistance of counsel claim to which *Ake* adds little. *See Adams v. Wainwright,* 804 F.2d 1526, 1535 n. 11 (11th Cir.1986), *modified on reh'g,* 816 F.2d 1493 (11th Cir.1987) (per curiam), *rev'd on other grounds,* 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989); *cf. Blake v. Kemp,* 758 F.2d at 531 (noting the link between minimally effective assistance of counsel and the need for adequate psychiatric evaluations).

in a state collateral proceeding. Notwithstanding the ballistics evidence introduced at trial, the other evidence at trial, particularly that testimony concerning Summitt's identification of Johnson as the individual who committed the crime, provided very strong evidence to convict Johnson. Similarly, given the strength of Summitt's eyewitness identification, we are confident that no fundamental miscarriage of justice will result from our holding that this claim is procedurally barred.

## VII. CONCLUSION

In conclusion, we affirm the district court's denial of Johnson's petition for a writ of habeas corpus on all claims except for the claim of ineffective assistance of counsel at sentencing. We vacate the district court's denial of Johnson's claim of ineffective assistance of sentencing counsel and remand that claim to the district court for further proceedings consistent with this opinion.

AFFIRMED IN PART; VACATED IN PART AND REMANDED.

HILL, Senior Circuit Judge, dissenting:

## I. I DISSENT

The majority's decision in this case departs sharply from Supreme Court precedent that requires a petitioner to make a colorable showing of "actual innocence" in order to obtain federal habeas review after an unexcused procedural default. According to today's decision, a petitioner need only make a colorable showing that a con-

---

1. The majority's new standard, which requires a federal court to review the merits of a claim whenever an alleged constitutional error probably influenced the sentencing body to impose the death penalty, applies as a general "miscarriage of justice" exception to claims that are otherwise (1) procedurally barred, (2) an abuse of the writ, or, as in the case under review, (3) barred under both doctrines. Review under the majority's standard is therefore unlimited.

2. I have noted elsewhere the dangerous tendency of federal courts to manipulate the jurisprudence of federal habeas review in order to vindicate constitutional claims that petitioners have long since waived and that do not affect the petitioner's underlying guilt or his eligibility

stitutional error probably prejudiced his chances for a more favorable sentence. Thus, so long as he can demonstrate a "reasonable probability" that a constitutional error affected the outcome of his sentencing, a petitioner may ignore state procedural law and obtain an unlimited number of federal habeas hearings, regardless of a state's interest in enforcing its procedural rules and achieving some semblance of finality in criminal cases.[1]

In short, the majority replaces the Supreme Court's "*actual* innocence" standard with a requirement that the petitioner make a colorable showing of prejudice.[2] The majority's new test "turn[s] the case in which an error results in a fundamental miscarriage of justice, the 'extraordinary case,' ... into an all too ordinary one." *Dugger v. Adams*, 489 U.S. 401, ——, 109 S.Ct. 1211, 1218 n. 6, 103 L.Ed.2d 435 (1989).

Today's opinion arrives at its startling result by way of a number of significant analytical mistakes and misinterpretations of recent case law. The majority (1) incorrectly translates the concept of "innocence" from the guilt phase of a trial into the capital sentencing context, (2) ignores the crucial distinction expressed in the Supreme Court's "miscarriage of justice" jurisprudence between "*actual*" and "*legal*" innocence, and (3) implicitly attempts to justify its standard by referring to arguments that a majority of the Supreme Court rejected in favor of a more limited scope of review for procedurally barred claims.[3] I dissent.

---

for a particular punishment. *See Gunn v. Newsome*, 881 F.2d 949, 966 (11th Cir.1989) (Hill, J., dissenting) ("Our [federal judges'] yearning for finality does not often equal our delight in insinuating our own ideas of right and wrong into the judgments of state courts. We tip our hats to finality, but create most ingenious contrivances to avoid it.")

3. My disagreement with the majority's decision in this case assumes for the sake of argument that, as the majority holds, Johnson has failed to demonstrate sufficient legal cause for his failure to make a timely assertion of his claims. Thus, my comments concerning the need to show actual innocence presupposes that the pe-

My remarks in dissent are confined specifically to whether Johnson had made a colorable showing of "actual innocence." A petitioner need not make a colorable showing of "actual innocence" in order to obtain appropriate relief for timely asserted errors, and much of the majority's analysis is accurate when applied to the evaluation of timely asserted claims of error.

## II. A DIFFERENT VIEW OF THE RECORD

Before turning to each of these points, I will refer briefly to the facts that led to Johnson's conviction and death sentence. I will also review the evidence that the majority claims would, absent the incompetence of Johnson's sentencing counsel, almost certainly have precluded a death sentence for Johnson. This reading of the record is not necessary to my conclusion that the majority has misinterpreted the meaning of "actual innocence" in the capital sentencing context;[4] however, I take issue with two impressions created in the majority opinion.

First, the record clearly demonstrates that Marvin Johnson did *not* shoot the victim, Woodrow Moulton, in the course of the gunfire exchanged between the men after Moulton grabbed a gun from behind the counter and fired upon Johnson as Johnson attempted to leave the scene of the armed robbery. The fatal shooting occurred *after* Moulton had emptied his revolver. According to eyewitness testimony, Johnson did not flee the scene after the gunfire ceased, but instead returned to within a few feet of Moulton, who at this time had dropped his weapon and held his hands in the air. Johnson stated, "You think you you're a

smart son-of-a-bitch don't you?", and shot Moulton in the chest at point-blank range.[5]

Johnson presented a defense at his sentencing hearing to the effect that his decision to shoot Moulton was the product of, *inter alia,* his extreme emotional disturbance in the face of the gunfire. Both the trial judge and the jury were free to consider this evidence in mitigation of Johnson's offenses.

I highlight these facts to provide the reader with a contextual appreciation for *both* the jury's recommendation of a life sentence *and* the judge's decision to impose the death penalty.

Second, the majority construes Johnson's sentencing counsels' failure to present certain newly proffered psychiatric evidence as extremely prejudicial. The majority contends that such evidence would have precluded a death sentence. *See ante* at 461–462.

The majority's treatment of the psychiatric testimony proffered by Johnson discloses a notable tension. On the one hand, the majority suggests that the evidence of Johnson's compulsion to obtain drugs indicates with a "high degree of certainty" that the trial judge would not, and by law could not, have overridden the jury in the face of such evidence. *Ante* at 462. On the other hand, the majority concedes that Johnson's lawyers may have made a "deliberate, tactical decision" not to pursue this line of evidence. *Ante* at 463. The majority's discussion of the possibility of strategic choice is both candid and revealing. One would expect that if the drug compulsion/duress evidence virtually mandated a life sentence for Johnson, the only remaining question would be whether the attorneys were or should have been aware of the evidence, since the decision not to

titioner in question cannot demonstrate cause and prejudice.

4. In other words, even if I (1) agreed with the majority's impression of Johnson's culpability under the facts of this case, and (2) shared the majority's enthusiastic assessment of the prejudice suffered by Johnson through the failure to present his newly proffered psychological evidence, I would conclude that Johnson has asserted at best a colorable claim of *legal* innocence or actual prejudice, rather than the dem-

onstration of *actual* innocence necessary to overcome an unexcused procedural default.

5. There was some dispute as to whether Johnson actually used the term "son-of-a-bitch" before shooting Moulton; however, the Florida Supreme Court and a prior panel of this court rejected this claim as meritless. *See Johnson v. Wainwright,* 806 F.2d 1479, 1487 (11th Cir. 1986).

pursue such death-preclusive evidence could hardly have been the product of reasonable professional judgment.

The majority's forthright consideration of strategic choice implies, quite correctly, that any testimony that emphasized Johnson's violent past and his compulsion to obtain drugs might have prejudiced his chances to receive a life sentence. Johnson's sentencing counsel made a motion *in limine* to exclude evidence of Johnson's criminal record and his recent escape from prison prior to the robbery. Counsel expressly stated that he wished to foreclose impeachment by not relying on character evidence. The majority acknowledges the very real prospect that both the judge and the jury might not have accepted the drug compulsion/duress theory as a mitigating factor, but instead would have considered Johnson's propensity toward violent crime—whether or not the product of drug addiction—as a nonstatutory *aggravating* circumstance.

Even assuming *arguendo* that Johnson could have proven that he suffered from an acute psychological compulsion to obtain drugs, and that the gunfire reduced his capacity to control his emotions,[6] both the judge and the jury still would have remained free to characterize Johnson's decision not to flee the store with the stolen drugs (the object of his compulsion), but to linger at the scene of the crime in order to execute the victim, as an *aggravating* factor in his crime.

I also note that Johnson's sentencing attorneys obtained a life recommendation from the jury without introducing the drug-related information. There is a strong inference that Johnson's counsel sought to safeguard the jury recommendation and may well have chosen not to jeopardize its momentum by exposing Johnson to the type of impeachment and prejudice described above.[7] The record suggests that Johnson's attorneys made a strategic choice not to interject a somewhat abstract psychiatric theory of mitigation, and that the failure to develop and introduce the drug-related psychiatric evidence was hardly *sine qua non* to Johnson's death sentence.

Although the majority acknowledges the very real possibility of a strategic choice by Johnson's counsel, it attempts to explain in two ways its conclusion that the newly proffered evidence of drug compulsion/duress would have virtually precluded a sentence of death.

First, the majority recognizes the disadvantages in the introduction of character evidence when it observes that the prosecutor had already made the judge and the jury aware, through Johnson's cross-examination and various other comments, *see ante* at 465, of Johnson's prior involvement with drugs and crime. Johnson's sentencing counsel had no strategic reason to hide Johnson's drug compulsion since the "damage," the majority implies, was already done. However, as the references to the record suggest, *see ante* at 465, these limited allusions to Johnson's criminal history differed substantially from the sort of emphatic disclosures that would have resulted if counsel had decided to present a theory of mitigation based on Johnson's past involvement with drugs.

Second, the majority suggests that the decision not to pursue the drug compulsion/duress theory was not the informed "product of careful and deliberate thought." *Ante* at 464. Johnson argues that since his sentencing attorneys failed to pursue a more complete psychiatric investigation in the month between the jury recommendation hearing and the sentencing hearing, they were unaware of the psychiatric evidence that Johnson now claims he can present. Thus, Johnson argues, his

---

6. The record reflects that Johnson's court-appointed psychiatrist did in fact testify that Johnson suffered from an inability to control his emotions in high stress situations.

7. A remand to determine whether Johnson's counsel did in fact make a strategic choice not to pursue and develop drug compulsion/duress

theory of mitigation is unnecessary since this issue relates to a question on the merits that neither the district court nor this court can reach in light of the procedural default and the absence of a colorable showing of "actual innocence."

attorneys could not have exercised professional judgment in not presenting such evidence.

The essence of the new psychiatric evidence that Johnson claims his sentencing counsel could not appreciate is that Johnson's addiction to drugs *caused* his inability to reason in the face of stressful situations, and that the extent of his disability was greater than his attorneys, as lay persons, could understand. On the other hand, Johnson's sentencing counsel (and, presumably, Dr. Yarbrough) clearly knew that Johnson was addicted to drugs, and that Johnson killed a man during a robbery of a drugstore in order to obtain drugs. In short, I discern nothing in the record that suggests that Johnson's attorneys were at all uninformed as to either (1) the nature of a possible drug compulsion/duress theory of mitigation, or (2) the significant risk that this theory of mitigation would backfire on Johnson.

The attorneys hardly needed a more complete psychiatric evaluation to foresee the response had they emphasized Johnson's past and thereby permitted the prosecution to exploit that information for its own purposes. More importantly, it is clear that what Johnson's sentencing counsel purportedly lacked, and what his collateral counsel now brings before this court, is a psychiatric gloss on a drug problem of which the sentencing attorneys were acutely aware. Indeed, Dr. Yarbrough presented the heart of this psychiatric defense when he testified at the sentencing hearing that Johnson's ability to control his impulses deteriorates significantly in the face of stressful events. Thus, the attorneys were able to present the duress theory quite effectively without the potentially damaging stress on Johnson's violent, drug-related criminal history.

My disagreement with the majority's decision in this case extends well beyond my interpretation of the record, however. I will attempt to illustrate the critical junctures at which I believe the majority has departed from the Supreme Court's "miscarriage of justice" case law to fashion a rule that entitles a habeas petitioner to virtually unlimited review for prejudicial errors.

### III.

#### A. *The Death Penalty Prior to Furman v. Georgia.*

The majority undertakes to review the historical development of death penalty jurisprudence over the past twenty years. This review misses, in my opinion, the essence of that history and skews the application of precedent to this case. The Supreme Court's treatment of the relationship between sentencing discretion, the death penalty, and the Eighth Amendment has resulted in an almost perfect jurisprudential circle.

Prior to *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1971), many states authorized the death penalty for any defendant found guilty of what I reluctantly refer to as "simple murder." The death penalty was not mandatory; the jury or other sentencing authority had unlimited discretion to grant the defendant mercy and impose life imprisonment rather than the death penalty.[8] The Supreme Court unequivocally denounced such discretion in *Furman,* concluding that unguided sentencing led to the discriminatory, arbitrary, and capricious imposition of the death penalty in violation of the Eighth Amendment. In short, The Court found no merit in discretion.

At least thirty states enacted new death penalty statutes in response to *Furman*'s

---

8. *See, e.g.,* Ga.Code Ann. § 26–1005 (Supp.1971) (effective prior to July 1, 1969). The jury's "recommendation of mercy" was both mandatory and unlimited in Georgia. *Id.* The court had no discretion to impose the death penalty if the jury recommended mercy. The trial court could impose absolutely no limits on the jury's ability to grant mercy for *any reason whatsoever. Wyatt v. State,* 220 Ga. 867, 142 S.E.2d 810 (1965) (trial court committed reversible error by limiting the jury's discretion to grant mercy according to "the evidence and circumstances" of the case); *Jennings v. State,* 212 Ga. 58, 90 S.E.2d 401 (1955) ("any instruction which tends to qualify th[e] right [to grant mercy], or point to the manner of its exercise, is cause for setting aside a verdict where no recommendation [for mercy] is made"); *Hill v. State,* 72 Ga. 131 (1883).

concern for unguided discretion. One group of states, including Louisiana and North Carolina, interpreted *Furman* to require the removal of *all* discretion in the capital sentencing context. These states passed laws that *mandated* the death penalty for certain statutorily defined crimes. The other group of states, including Georgia, opted to provide guided discretion in the sentencing process by listing certain statutorily defined aggravating and mitigating circumstances. These latter states undertook to confine the sentencing body's discretion within the statutory factors.

The Supreme Court reviewed these two distinct types of statutes during the same term in 1976, struck down mandatory death penalty statutes,[9] and upheld statutes that provided for discretion.[10] Limited discretion, according to the Court, was both consistent with, and necessary to, the constitutional requirement of an individualized evaluation of the death penalty's appropriateness. So began the arc back toward discretion. The *Furman* Court announced a retreat from discretion in capitol sentencing; in *Woodson, Roberts, Gregg, Proffitt* and *Jurek*, that retreat arched backward toward a constitutional appreciation of discretion.

In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Court did not merely tolerate discretion, but mandated it! Death penalty statutes following *Furman* had apparently confined the exercise of discretion "at both ends." These statutes generally required the sentencing authority to consider certain *statutorily specified* aggravating circumstances and *statutorily specified* mitigating circumstances found to accompany the murder.

The trial court in *Lockett* had apparently concluded that to allow consideration of claimed mitigating circumstances not in the statute would authorize the type of unbridled discretion condemned in *Furman*. The Supreme Court held, however, that the Constitution required states to afford the sentencing authority the discretion to consider *any* circumstance claimed to be mitigating, whether encompassed in the statute or not. Thus, the Court constitutionally imposed unbridled discretion in the grant of mercy. It appeared, however, that the Court may have left the consideration of aggravating circumstances to those prescribed in the various state statutes.

The Court then "dropped the other shoe." In *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) and *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).[11] In these cases the Court revealed its appreciation of the fact that a defendant is guilty of a murder for which the death penalty could be imposed where it is found that the murder was accompanied by one or more of the statutory aggravating circumstances. Thus, the *capital* crime is not murder; it may be called aggravated murder or capital murder. Once convicted of such a crime, not only can unlimited mitigating circumstances as per *Lockett* be shown, but the state can prove facts in aggravation of the capital crime, whether listed as statutory aggravating circumstances or not.

## B. The Death Penalty Today: "Aggravated Murder."

Prior to *Furman*, the sentencing authority in a murder case had unfettered discretion to consider virtually anything asserted

**9.** See *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (mandatory death penalty statute unconstitutional); *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976) (same). See also, *Roberts v. Louisiana*, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977) (mandatory death sentence for killing of police officer unconstitutional).

**10.** *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (upholding guided discretion statute that requires the establishment of certain aggravating circumstances); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (upholding guided discretion statute that requires establishment of certain aggravating circumstances and a balancing of circumstances); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (upholding guided discretion statute that includes, among other factors, future dangerousness in the determination of whether to impose death).

**11.** I suggest that for a full understanding of *Zant v. Stephens* it is well to review the Supreme Court of Georgia's response to the Court's certified question found in the full bench decision of the court in *Zant v. Stephens*, 250 Ga. 97, 297 S.E.2d 1 (1982).

in mitigation. *Lockett* re-established that practice. Prior to *Furman,* the sentencer in a capitol case could consider anything, in its unfettered discretion, in aggravation.[12] *Barclay* and *Zant* have re-established this practice so long as at least one statutory aggravating circumstance accompanies the murder. In practical terms, the Court has reinvigorated discretion in capital sentencing in order to guarantee an individualized sentencing process.

Engineers and surveyors use the phrase "failure to close" to express the idea that one has measured from a known reference point to certain unknown points without returning to the original reference point. I believe this expression aptly describes the historical progression of death penalty jurisprudence. Shortly after *Lockett*, I noted the "inherent tension" between the Court's aspiration for "individualized sentencing and objective standards." *Moore v. Balkcom*, 716 F.2d 1511, 1521 (1983) (en banc). Justice Scalia has recently denounced this tension as internally contradictory. *Walton v. Arizona,* — U.S. —, —, 110 S.Ct. 3047, 3051–52, 111 L.Ed.2d 511 (1990) (Scalia, J., concurring).[13]

I suggest that, commencing with *Furman*, jurists of this age have repeated the philosophical, legal and constitutional analysis of death penalty jurisprudence which has been done by jurists in earlier times. The tension between objectivity and individuality is not new.[14]

The Court seems to have resolved the tension by making one full turn on a "coil spring" or a "spiral staircase" of case law.

The Court has returned the law largely to its pre-Furman state but has ratcheted the doctrine up one step from its starting point. As I explained above, prior to *Furman* "simple murder" was a capital crime. Today the level of criminal conduct for a capital crime has been raised; a defendant must commit the new crime of "capital murder" or "aggravated murder" in order to be eligible for the death penalty. This new crime is defined as "murder accompanied by one or more of the statutory aggravating circumstances." The sentencing authority may not impose the death penalty for "simple murder." The essential point of this development in the law, at least with regard to Johnson's claim of "actual innocence," is that when the prosecution has proved that the defendant committed aggravated murder, the sentencing authority has very broad discretion to sentence the defendant either to life imprisonment or the death penalty.[15]

As I explain below, since Johnson's proposed showing of factual error does not cast doubt on his guilt of a crime for which the sentencing authority in his case could impose the death penalty (i.e., "murder accompanied by at least one statutory aggravating circumstance"), he has not made a colorable showing of "actual innocence." Therefore, Johnson is not entitled to a review on the merits of his defaulted constitutional claim.

## IV. THE MAJORITY'S "ACTUAL PREJUDICE" TEST

Before considering the majority's proposed test for determining when a defen-

---

**12.** To my knowledge, the pre-*Furman* statutes rarely employed the term "aggravating circumstance." *See, e.g.,* Ga.Code Ann. § 26–1005 (Supp.1971) (effective prior to July 1, 1969). Sentencing authorities implicitly gave effect to the concept of an "aggravating circumstance," however, by factoring in such a condition as a "reason not to recommend mercy."

**13.** Justice Scalia argues that *Lockett* "completely exploded whatever coherence the notion of 'guided discretion' once had." *Walton v. Arizona,* — U.S. at —, 110 S.Ct. 3047, 3051–52.

**14.** The debate with regard to the ideal level of discretion in capital sentencing predates *Furman.* State jurists have long recognized the strain that develops when attempts to confine

discretion in sentencing collide with the need for individualized sentencing. *Compare Wyatt v. State,* 220 Ga. 867, 142 S.E.2d 810 (1965) (Chief Justice of Georgia Supreme court critical of rule that forbids any limits on jury's discretion to grant mercy and makes it error for trial judge even to require sentencing jury, in deciding between death and life imprisonment, to take "into consideration all the facts and circumstances of the case."), *with Chatterton v. Dutton,* 223 Ga. 243, 154 S.E.2d 213 (1967) (upholding unlimited discretion in granting mercy against due process challenge).

**15.** Of course, the state could not urge race, sex, or constitutionally protected activity as an aggravating factor. See footnote 11 above.

dant is "innocent of the death penalty," I must clarify my reluctant use of the term "innocence" in connection with a sentence or punishment. To my mind, it makes little sense to say that a defendant is "innocent" or "guilty" of a sentence. The concepts of "innocence" and "guilt" apply only to the commission of a crime. A sentence is not a crime. The Supreme Court has employed this expression as a means of translating from the guilt phase of a trial the idea that a defendant can be "ineligible" for a certain sentence. As I discussed above, a person guilty of a murder *not* accompanied by at least one statutory aggravating circumstance (i.e., "simple murder"), is not eligible for a death sentence. I will refer to "innocence of sentence" to mean "innocent of a crime the commission of which makes the offender eligible for the death penalty."

The majority purports to articulate a standard to determine whether a constitutional error has skewed a "sentencing body's deliberative process ... to such a degree that its ultimate conclusions are probably factually in error." *Ante* at 468. Asking the wrong question necessarily begets the wrong answer. When a defendant is eligible for the death penalty (by virtue of having committed first-degree murder accompanied by at least one statutory aggravating circumstance), it is nearly impossible to determine that the sentencing body's ultimate conclusion that imprisonment is more appropriate than the death penalty (or *vice versa*) is "correct" or "accurate," or "incorrect" or "inaccurate."

The nature of the question asked by the majority illustrates its misinterpretation of

the "actual" or "factual" innocence standard. While factual errors can undermine the factual premises from which the sentencing body reaches its ultimate conclusion, one can never say that the ultimately discretionary choice by the sentencing body is "factually in error." Other than in the context of a general proportionality review, a court lacks objective criteria by which to divine that it is "factually incorrect" to sentence a particular death-eligible defendant to death, or to life imprisonment instead. So long as the defendant has committed murder *accompanied by at least one statutory aggravating circumstance,* (and there are no factual errors that undermine this finding), there can be no "correct" or "incorrect" sentencing outcome.

It is, however, possible to determine that a constitutional error led to a factual error, and that the factual error probably influenced the sentencing body to select the death penalty. In fact, courts often define "prejudicial error" in just this fashion. It is within Congress' power to enable federal courts to review these errors in habeas proceedings, regardless of a litigant's procedural default or of an abuse of the writ. The Supreme Court has interpreted habeas jurisdictional statutes to require, in such defaulted or abusive cases, more than prejudicial error.[16] The Court reached this conclusion in light of certain expressions of congressional intent and a serious concern for comity and finality.

In answering what I perceive to be both a wrong and an unanswerable question, the majority proposes a test that equates "correctness" or "accuracy" of sentence with a deliberative process free from factual er-

---

**16.** The majority attempts in vain to distinguish its standard from the ordinary test for prejudice. The majority is correct that the Supreme Court's has admonished courts to apply the test for "actual innocence" in light of *all* probative evidence, including evidence that was admitted (or not brought before the sentencing body) as a result of constitutional error. *See ante* at 467–469. *See Kuhlman,* 477 U.S. at 454 n. 17, 106 S.Ct. at 2627 n. 17, (citing Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,* 38 U.Chi.L.Rev. 142, 160 (1970)); *Smith v. Murray,* 477 U.S. at 538, 106 S.Ct. at 2668. I recognize that the majority applies its test in light of *all* probative evidence. My concern is

that the majority's test seeks to answer the wrong question. The majority's standard asks whether, but for a factual misimpression with regard to aggravation or mitigation, the sentencing body probably would have exercised its discretion in a different manner. The Supreme Court has made clear that the question is whether, in light of all probative evidence, including evidence that was or was not admitted as a result of the alleged constitutional error, the petitioner has made a colorable showing that he has suffered a conviction or received a punishment that the adjudicator of guilt or the sentencing body was not free to impose under the actual facts.

rors that affect the exercise of discretion. According to the majority, if the petitioner makes a colorable showing of the following, he is entitled to a hearing on the merits of his claim—regardless of an unexcused procedural default or an abuse of the writ:

> (1) the sentencing body was under a misperception as to the factual background of either the offender or the offense, and (2) but for those factual misperceptions held by the sentencing body, the petitioner probably would not have received a sentence of death.

*Ante* at 468–69.

The majority's test has only a slight bearing on the petitioner's "innocence" of the sentence imposed. It instead looks to the purity of the deliberative process and grants relief for errors that probably affected the outcome. The majority holds that a petitioner is "guilty" of the death penalty only if the process by which he received that sentence is absolutely free from any omissions or presentations of fact that might have influenced the sentencing body's exercise of discretion. Conversely, a petitioner is "actually innocent" of the death penalty, according to the majority, if any "factual" error with regard to aggravation or mitigation probably influenced the deliberative process. In short, the majority sets forth a roughly accurate description of the standard for evaluating the significance of a *timely raised* allegation of constitutional error in connection with the sentencing process.[17]

## V. THE "ELIGIBILITY TEST" FOR "ACTUAL INNOCENCE"

The majority points out that under one interpretation of our *en banc* decision in *Moore v. Zant,* 885 F.2d 1497 (11th Cir. 1989), a petitioner must make a colorable showing that a constitutional error led to a factual mistake with regard to his *eligibility* for the death penalty. *Ante* at 470. Under this reading of *Moore,* the petitioner must demonstrate tenably a factual error in *either* the conclusion that (1) he committed the underlying murder, *or* (2) at least one statutory aggravating circumstance accompanied the murder. *See id.* at 1513. Indeed, this is precisely what we held in *Moore.*

The majority, apparently reading *Moore* as holding what the dissent felt it should have held, rejects this interpretation as (1) inconsistent with the common understanding of "innocence of the death penalty," or as an improper translation of the "actual innocence" test in the capital sentencing context, and (2) contrary to fundamental principles that govern the imposition of capital punishment. I will consider each of these points.

Although there are doctrinal particulars that a clear majority of the Justices have not yet accepted,[18] the Supreme Court has placed beyond dispute several aspects of its "fundamental miscarriage of justice" doctrine. On June 26, 1986, the Court announced three significant decisions that establish the circumstances under which a federal court may review the merits of a claim that is otherwise procedurally barred or subject to the abuse of the writ doctrine.

In *Murray v. Carrier,* 477 U.S. 478, 495–96, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986) (5–4 majority), a majority of the Court held that "where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." This statement expresses a fundamental tenet of our administration of criminal law: "an inno-

---

**17.** The majority's heavy reliance on *Porter v. Wainwright,* 805 F.2d 930, 936 (11th Cir.1986), and similar cases, *see ante* at 462, makes clear that it seeks to replace the Supreme Court's "actual innocence" test with the standard presently used to determine prejudice in the sentencing context. *Porter* did *not* involve either a procedural default or an abuse of the writ, both of which the majority concedes are present in this case. In simple terms, *Porter* explains the method by which a court determines whether a petitioner is entitled to relief for a constitutional error that is *timely asserted* (or an untimely assertion of error for which a sufficient legal excuse exists).

**18.** *See* footnote 21 below.

cent person ... in custody or in jeopardy of the execution of a death sentence [must have unlimited opportunities] to repair to a court of justice for relief." *Gunn v. Newsome,* 881 F.2d 949, 966 (Hill, J., dissenting).[19]

In *Smith v. Murray,* 477 U.S. 527, 537, 106 S.Ct. 2661, 2666, 91 L.Ed.2d 434 (1986), the same five Justices acknowledged the difficulties in translating the concept of "innocence" from the guilt phase of a capital trial to the sentencing context. *See Clark v. Dugger,* 901 F.2d 908, 914 (11th Cir.1990). The *Smith v. Murray* Court also reiterated that, even in the sentencing context, courts must continue to distinguish between " 'actual,' as distinct from 'legal,' innocence." 477 U.S. at 537, 106 S.Ct. at 2666. The majority again rejected the view that certain claims other than those implicating "actual innocence" can rise to the level of a "miscarriage of justice." [20]

A more recent majority of the Court expressly reaffirmed its holding that the "actual innocence" test limits a federal habeas court's authority to reach the merits of defaulted claims for which a petitioner cannot demonstrate cause. *Dugger v. Adams,* 489 U.S. 401, —— n. 6, 109 S.Ct. 1211, 1217 n. 6, 103 L.Ed.2d 435 (1989).

In *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), a plurality of the Court held that the "ends of justice" require a federal court to entertain successive petitions otherwise barred by the abuse of the writ doctrine "only where the prisoner supplements his constitutional claim with a colorable showing of factual innocence." *Id.* at 454, 106 S.Ct. at 2627.[21]

In both *Smith v. Murray* and *Dugger v. Adams,* as in the present case, the Court considered allegations that constitutional errors in those cases led to factual inaccuracies in the sentencing process. In *Smith v. Murray* the Court considered the importance under the "actual innocence" standard of certain highly prejudicial statements made by the defendant to his court-appointed psychiatrist. The trial court admitted these statements at Smith's sentencing in violation of Smith's Fifth and Sixth Amendment rights. Like Johnson, Smith had defaulted on these claims. The Court found that the alleged error did not concern a factual "inaccuracy" in the sentencing process since the inadmissible evidence was both probative and reliable. The majority in the case at hand attempts to distinguish *Smith v. Murray* by noting that Johnson's allegations of error do in fact involve claims of factual inaccuracies. *Ante* at 467–68.[22]

**19.** The *Murray v. Carrier* majority made clear that the "actual innocence" test defines the limits of federal habeas jurisdiction to review defaulted claims. *Id.* 477 U.S. at 493–94, 106 S.Ct. at 2646–47. *Cf. id.* at 497, 106 S.Ct. at 2650 (Stevens, J., concurring in the judgment) (arguing for a broader standard to determine "fundamental injustice" that warrants a review of the merits; criticizing the "actual innocence" test as unduly restrictive); *id.* 106 S.Ct. at 2678 (Brennan, J., dissenting) (making similar arguments to the effect that the Court should employ a balancing test to determine whether review of a defaulted claim is appropriate). The test announced by the majority today pays lip service to the "actual innocence test" as a limiting principle of habeas jurisdiction, but has the practical effect of making reviewable the broader class of defaulted claims urged by the dissenters in *Murray v. Carrier* and the other cases discussed in the text below.

**20.** *Id.* 477 U.S. at 542, 106 S.Ct. at 2670 (Stevens, J., dissenting) (questioning "why *Carrier's* clearly correct holding about the propriety of the

writ in a case of innocence must also be a *limiting* principle on the federal court's ability to exercise its statutory [habeas] authority") (emphasis in original).

**21.** Justice White voted with the majority in *Murray v. Carrier* and *Smith v. Murray,* but neither Justice White nor Justice Blackmun joined either Justice Powell's plurality opinion or Justice Brennan's dissent in *Kuhlmann.* Two members of a panel of this court have suggested in dicta that the *Kuhlmann* plurality was incorrect to limit federal habeas review of an otherwise barred successive petition only to instances in which the petitioner can demonstrate a colorable showing of "actual innocence." *Martin v. Dugger,* 891 F.2d 807, 808–10 (11th Cir.1989).

**22.** Even if I agreed with the majority's characterization of the potential value to Johnson of introducing his proffered psychiatric evidence, I could not agree that the failure to present such evidence resulted in the admission of false "facts" and "precluded" the development of true

The majority ignores the "critical role" that the alleged error in *Smith v. Murray* "played ... in the determination that death [was] an appropriate penalty"; that error, in fact, "made the difference between life and death in the jury's consideration of [Smith's] fate." *Id.* at 539, 106 S.Ct. at 2668 (Stevens, J., dissenting). The Court recognized that Smith was "legally innocent" in the general sense, that if the trial court had properly suppressed his statements the sentencing body probably would have imposed life imprisonment rather than the death penalty. The Court nevertheless held that the claim was "unrelated to [actual] innocence." *Id.* at 539, 106 S.Ct. at 2668. The sentencing body in *Smith v. Murray* would have remained free, even if the trial court had excluded Smith's statements, to impose the death penalty; thus Smith's claim of error did not implicate his "actual innocence" of the death penalty.

In other words, while factual inaccuracy in the guilt or sentencing context may well be *necessary* to a claim of "actual innocence," factual inaccuracy is not *sufficient* unless the inaccuracy demonstrates, at least colorably, that the petitioner is "actually innocent," or ineligible for, either an adjudication of guilt or the sentence imposed. If, as I have explained above, prejudicial factual inaccuracy alone is enough to warrant review of a defaulted claim, then the "actual innocence" standard is meaningless.[23]

I recognize that the Court has not expressly defined "actual innocence" in the context of the death sentence. *Id.* 489 U.S. at —— n. 6, 109 S.Ct at 1217 n. 6. In the guilt phase of a trial, a defendant is "innocent" of the crime if, under the alleged facts, he or she is not eligible for an adjudication of guilt. As I explain below, "actual eligibility" and "legal eligibility" are distinct; however, a defendant is "innocent" of a crime only if he is ineligible for an adjudication of guilt—either by virtue of a (correct or incorrect) finding of innocence, or through objective facts that prove that a

---

"facts." *See ante* at 475. First, even assuming *arguendo* that the sentencing attorneys did not exercise reasonable professional judgment in failing to apprise Dr. Yarbrough adequately regarding Johnson's prior involvement with drugs, or to pursue this theory after the jury recommended life, it seems odd to say that the error "precluded" the development of true facts. I think it fair to presume that Dr. Yarbrough knew that Johnson was convicted for killing a person in the course of robbing a drugstore for drugs, and that the attorneys could expect an examining psychiatrist to have inquired into the patient's involvement with drugs. Second, I submit that neither the judge nor the jury were required to find that the speculative opinion testimony proffered by Johnson today establishes as a matter of law either the statutory or nonstatutory mitigating circumstances suggested by the majority. *See ante* at 477. Finally, and most importantly, the Supreme Court has made clear that courts must apply the "admission of false facts/preclusion of true facts" test to determine whether the defendant is *actually,* not *legally,* innocent of the crime charged or sentence imposed. Thus, even if one could characterize Johnson's new psychiatric evidence as having caused the admission of false "facts" or "precluded" the admission of true "facts," such evidence suggests prejudice, not "actual innocence." See the discussion in the text below.

**23.** *Dugger v. Adams* also illustrates this point. In that case, the Court rejected the petitioner's claim that an alleged *Caldwell* error established a colorable showing of "actual innocence." *See Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The petitioner asserted that the trial judge violated the Eighth Amendment when he mistakenly advised the jury that its sentencing recommendation was merely advisory. The statements purportedly misled the jury as to its role in the capital sentencing process under Florida law. The *Dugger v. Adams* majority acquiesced in the view (expressed in Justice Blackmun's dissent) that the alleged *Caldwell* error did not concern merely "the [erroneous] inclusion or exclusion of particular evidence"; the error was "global in scope" and pervasive in its tendency to influence the jury's recommendation. 489 U.S. at ——, 109 S.Ct. at 1224 (Blackmun, J., dissenting). Rather than refute the dissent's characterization of the facts, the majority instead expressly rejected the idea that "a fundamental miscarriage of justice results whenever 'there is a substantial claim that the constitutional violation undermined the accuracy of the sentencing decision.'" *Id.* at —— n. 6, 109 S.Ct. at 1218 n. 6 (quoting Blackmun, J., dissenting, *id.* at ——, 109 S.Ct. at 1219 n. 4). Since, as in the case at hand, the sentencing body was free to impose the death penalty despite the alleged error—regardless of whether it would have done so in the absence of the error—the claim did not implicate Adams' "actual innocence" of the death penalty.

guilty finding was wrong because the defendant did not commit each and every element of the crime charged.

A properly convicted defendant's claim to "innocence" in the sentencing context is likewise tied to eligibility. A convicted defendant is eligible for any punishment within the discretion that the legislature accords the sentencing body. One cannot say that the defendant is "innocent" of the sentence imposed if the defendant actually committed the necessary acts that would make him eligible for the particular punishment chosen. Even if the guilty defendant can demonstrate that a constitutional error led to a factual inaccuracy—which in turn prejudiced the outcome of the sentencing body's deliberative process—the defendant is not "innocent" of the sentence imposed.

The somewhat narrower scope of "innocence" in the sentencing phase of a trial, as compared to the guilt phase, results from the unique role that discretion plays in sentencing. The discretionary nature of sentencing necessarily reduces the objective criteria by which a court may determine that a particular sentence is "wrong" or "unauthorized." Only under very limited circumstances is a court competent to determine that a defendant is ineligible for a particular sentence despite the sentencing body's decision to the contrary. In the guilt phase of a trial, innocence and guilt have an objective existence that a court may under certain circumstances discern—either at trial or in a collateral proceeding. The petitioner may assert new facts (or improperly excluded facts) with regard to guilt, and a court may determine that, given those facts, a finding of guilt was unauthorized.

At sentencing, by contrast, there are few "elements" necessary for a particular sentence. A showing that an erroneous factual premise probably influenced the sentencing body does not *necessarily* mean that the defendant is "innocent" or ineligible for the sentence imposed. Only under very limited circumstances may a court determine that a factual showing demonstrates the defendant's ineligibility for the sentence imposed in light of purportedly inaccurate or incomplete facts.[24] The sentenced defendant must demonstrate not merely that the error affected the sentencing outcome, but that the error resulted in a sentencing outcome for which the defendant is not eligible by virtue of his conduct.

In the capital sentencing context, the defendant becomes eligible for the death sentence only if the sentencing body *correctly* finds that he has committed a crime for which the sentencing body could, in its discretion, sentence him to death.

The Eighth and Fourteenth Amendments to the Constitution, together with the pertinent state law capital punishment statute, afford the capital defendant a number of protections against an arbitrary and capricious imposition of the death penalty. If the defendant raises an error in a timely fashion (or furnishes a sufficient legal excuse for untimeliness), a federal habeas court will grant an appropriate remedy for a violation of the defendant's statutory or constitutional rights that probably affected the outcome of the sentencing body's deliberative process. The defendant is afforded numerous opportunities to have a court consider the merits of his claims.[25]

---

**24.** At risk of belaboring the obvious, I repeat that my comments are confined to an analysis of "innocence," not prejudicial error.

**25.** Roughly speaking, the defendant has at least the following opportunities to obtain relief for an error *regardless of his guilt or innocence of the underlying crime:* (1) a motion before the trial court to correct or avoid the error, (2) a motion for a new trial in light of the error, (3) a motion to set aside the conviction, (4) a motion to modify his sentence, (5) direct appeal, (6) appeal or petition for review to the state supreme court, (7) petition for certiorari to the United States Supreme Court for denial of direct

appeal, (8) collateral attack in a state court, (9) appeal of the denial of collateral relief in state court, (10) a petition for certiorari to the United States Supreme Court for the denial of state collateral relief, (11) a collateral attack in federal district court, (12) appeal of the denial of federal habeas relief in a federal court of appeals, and (13) a petition for certiorari to the United States Supreme Court for the denial of federal habeas relief.

The defendant/petitioner can of course (1) lose on the merits in all of the forums, (2) procedurally default or waive the claim, or (3) abuse the writ and lose the opportunity to assert

Nevertheless, any error that does not affect the defendant's eligibility for the death sentence does not implicate his "innocence" of that sentence. If, despite the alleged error, a reasonable sentencing body *could* impose death as a punishment for the crime committed, the defendant is not "innocent of the death penalty."

The Supreme Court has expressly acknowledged that there are two distinct types of eligibility for a finding of guilt or the imposition of a particular sentence. I speak here of " 'actual,' as distinct from 'legal,' innocence." *Smith v. Murray*, 477 U.S. at 537, 106 S.Ct. at 2666. At trial, the defendant is *legally* innocent if the state fails to present legally competent evidence sufficient to prove beyond a reasonable doubt that the defendant committed every element of the crime charged. If a convicted defendant demonstrates that a constitutional error influenced the jury to find that the state proved its case beyond a reasonable doubt where, absent the error, the state could not have, the defendant has made a colorable showing of *legal* innocence. If, for example, the state convicts a defendant largely on the weight of a confession that the defendant alleges the state obtained in violation of his Fifth Amendment right against self-incrimination, and it appears that the jury would necessarily have entertained a reasonable doubt in the absence of such evidence, the defendant's

alleged constitutional error makes·a colorable showing of *legal* innocence.[26] If the judge had excluded such evidence at trial, the prosecution could not have carried its burden of proving each element of the crime beyond a reasonable doubt. This claim would afford the petitioner relief if he asserted it in a timely fashion. The same is not the case if, like Johnson, the petitioner defaults on the claim.[27]

After the petitioner has defaulted on the claim, the focus of review narrows and a federal habeas court may not hear the claim unless the petitioner overcomes the jurisdictional bar by making a colorable showing that he is "actually innocent" of the crime. If the confession is reliable, then the defendant is not "actually innocent" of the crime—even if the state could not have proven him guilty without the confession.[28]

## VI. THE MAJORITY'S CRITIQUE OF THE "ELIGIBILITY TEST"

The majority claims that a definition of "actual innocence" that depends upon the petitioner's ineligibility for the sentence "transform[s] the accepted meaning of being innocent of the death penalty." *Ante* at 473. A defendant is "innocent of the death penalty" if, the majority observes, *see ante* at 473, the sentencing body determines that under the circumstances

the claim. If the case does not involve the loss of life or liberty, when the petitioner has exhausted or waived his opportunity for review, the result becomes final. Where the petitioner's life or liberty is involved, however, he is always entitled to obtain review of a colorable claim of "actual innocence."

**26.** *See* Friendly, *supra* footnote 16, at 163–64 (making a similar point but distinguishing involuntary confessions).

**27.** The analysis is the same if the alleged error involves the exclusion or failure to present evidence on behalf of the defendant rather than the erroneous admission of evidence. That is, the same logic applies if, as in Johnson's case, the error concerns the erroneous exclusion of probative and admissible evidence. The fact that the evidence probably would have influenced the jury to make a finding or choose a sentence favorable to the defendant is at best a showing of "legal innocence." If, even in light

of the new evidence, a reasonable jury still could have convicted the defendant—or, in the capital sentencing context—if the sentencing body still could have exercised its discretion to impose the death penalty, the defendant is not "actually innocent" of the sentence imposed.

**28.** *See Kuhlmann v. Wilson*, 477 U.S. at 454, 106 S.Ct. at 2627 (even assuming *arguendo* that use of cellmate informant violated petitioner's Sixth Amendment rights, and even though cellmate's testimony was *sine qua non* to conviction, petitioner failed to make out colorable showing of "factual innocence"); *Smith v. Murray*, 477 U.S. at 538, 106 S.Ct. at 2667 (error in admitting highly prejudicial statements made by petitioner to psychiatrist was "unrelated to [actual] innocence"). *Cf. Murray v. Carrier*, 477 U.S. at 495–97, 106 S.Ct. at 2649–50 (conditionally dismissing petitioner's defaulted claim unless trial court determined on remand that victim's statements established petitioner's "actual innocence" of rape).

presented by the prosecution and the defendant, life imprisonment is the more appropriate punishment.[29] Likewise, if a jury finds a defendant innocent of a particular crime, he is "innocent" in the general sense that no court can reweigh the evidence and impose a guilty verdict. Even if the defendant did in fact commit each element of the crime, the state failed to prove its case to the jury beyond a reasonable doubt.

The majority's observation is irrelevant to an analysis of "innocence of the death penalty" when the sentencing body has found, as in Johnson's case, that the death penalty *is* the appropriate punishment for the crime committed. I submit that so long as the petitioner has made no showing that the alleged error deprived the sentencing body of discretion to impose the sentence of death, the petitioner has not made a showing of *"actual* innocence." If the petitioner demonstrates that an alleged constitutional error probably influenced the sentencing body to choose the death penalty where it otherwise would not have done so, he has made a colorable showing of prejudicial error, or perhaps "legal innocence." These observations do not "transform" what it means to be "innocent of the death penalty"; they merely clarify the distinction between "legal" and "actual" innocence.[30]

According to today's majority opinion, a colorable showing of "legal innocence" is tantamount to a showing of "actual innocence." Even if, despite the alleged constitutional error, the sentencing body could have chosen the death penalty, the defendant is *"actually* innocent" of the death penalty if the error probably influenced the

sentencing choice. *Ante* at 472–73. "[I]t is not necessary," according to the majority, "to establish that one is innocent of *all* aggravating circumstances" in order to demonstrate that one is innocent of the death penalty. *Ante* at 473 (emphasis added). Similarly, a defendant need not disprove each and every element of the crime charged in order to establish his innocence. The majority's observation merely clarifies that even if the state could prove the defendant guilty of at least one statutory aggravating circumstance, the petitioner remains free to prove that but for the alleged error, the sentencing body probably would have chosen life imprisonment *despite* the existence of one or more statutory aggravating circumstances.

As with its earlier observation, the majority's analysis is inapplicable to the question at hand. The test that I propose for determining "actual innocence" of the death penalty only requires the petitioner to disprove *one* essential element of the crime for which the sentencing body has imposed the death penalty. As I explained above, under current Supreme Court case law, a sentencing body may impose the death penalty for what I term "aggravated murder," or "first-degree murder accompanied by at least one statutory aggravating circumstance." To require the petitioner to make a colorable showing that (1) he did not commit the underlying murder, *or* (2) no statutory aggravating circumstances accompanied the murder, is to demand no more than that the petitioner demonstrate an absence of at least *one* of the elements of a crime for which he is eligible to receive

**29.** Note that I refer to the "sentencing authority," not simply "the jury." In states like Florida, a jury's recommendation is not mandatory and the "sentencing body's" responsibility for sentencing in capital cases is shared between the jury and the trial judge. See footnote 33 below.

**30.** The majority seems to acknowledge, *see ante* at 467–68 that the Supreme Court held in *Smith v. Murray* that even if the petitioner demonstrates his *"legal* innocence" of the death penalty (i.e., but for the error the jury would necessarily have chosen life imprisonment), the petitioner is not entitled to relief if he is not *"actually* innocent" of a death-eligible crime (i.e., the jury

still *could* have, even if it might not in fact have, chosen the death penalty). I reiterate that a colorable showing that the error led to the conviction of one whom the jury would not have convicted, or a punishment that the sentencing body would not have imposed, will entitle the habeas petitioner to relief when he has not defaulted on the claim or abused the writ. Nevertheless, if the untimely claim fails to make a colorable showing that the petitioner was not eligible for such treatment, the petitioner has not demonstrated a "miscarriage of justice" as defined under *Murray v. Carrier, Smith v. Murray, Kuhlmann,* and *Dugger v. Adams.*

death as a punishment.[31]

The majority's final critique of the standard that I have outlined is that it conflicts with a fundamental principle of the Supreme Court's modern capital jurisprudence—the requirement of an individualized sentencing process. The majority suggests that to review the merits of Johnson's claim, despite his unexcused default, would further protect his constitutional right to an individualized consideration of all relevant mitigating circumstances.

Virtually every petitioner could argue that reviewing the merits of his constitutional claim despite a default would further protect the right at issue. The petitioner in *Smith v. Murray*, for example, argued that the Due Process Clause entitled him to a sentencing process free of constitutionally inadmissible and highly prejudicial statements made in confidence to his psychiatrist. By the same token, the petitioner in *Dugger v. Adams*, maintained that the Eighth Amendment entitled him to a sentencing process free from the taint of jury instructions that distorted the jury's understanding of its responsibility. In fact, every petitioner could marshal the same argument in favor of infinite opportunities for review each time a habeas court refuses to reach the merits of a waived or defaulted claim. The dissenters in *Murray v. Carrier, Kuhlmann, Smith v. Murray,* and *Dugger v. Adams* have argued for this broader reading of "miscarriage of justice" that would vindicate the interest in protecting these rights despite procedural default. *See* footnotes 19 and 20 above. A majority of the Supreme Court has consistently rejected this position. The Court has steadfastly held that neither the Constitution nor federal statutes support this expansive notion of habeas jurisdiction.

If the petitioner cannot demonstrate either an excuse for the default or a colorable theory of "actual innocence," the damage to comity and finality, and the need to avoid the "sporting theory of justice" that has arisen from virtually ceaseless criminal appeals and repetitive habeas review, outweighs the benefit of expanded review.[32] The Court has also made clear that the limitations on habeas jurisdiction over defaulted claims apply in capital cases despite the irrevocable nature of the death penalty. *Smith v. Murray*, 477 U.S. at 538, 106 S.Ct. at 2667.

## VII. CONCLUSION

As the majority observes, the Constitution and state death penalty statutes protect the *process* by which the capital defendant is sentenced. Any violation of these protections will afford the petitioner relief if the error is timely raised and the defendant suffered prejudice as a result.[33]

However, a court must look to the present definition of capital murder to de-

---

**31.** I note that under the test I propose today, even a petitioner who is actually guilty of first-degree murder is entitled to the review of a defaulted claim if he can make a colorable showing that the crime of which he is guilty is not a crime that makes him eligible for the death penalty.

**32.** The judicial and scholarly acknowledgement of the institutional costs of the more expansive theory of habeas review, and its drain on the finite judicial capacity to review meritorious claims, is universal. See the authorities cited in *Gunn v. Newsome*, 881 F.2d at 966 (Hill, J., dissenting).

**33.** The myriad different requirements for the death penalty in various states are irrelevant to whether a petitioner has made a showing of "actual innocence" through his alleged claim of error. In Johnson's case, Florida requires the sentencing body to balance the aggravating circumstances against the mitigating circumstances. Florida also requires a two-part sentencing process in which the jury makes a recommendation but the trial judge enters the actual sentence. Under Florida law, the court must accord the jury's recommendation great weight. *Tedder v. State*, 322 So.2d 908, 910 (Fla.1975). *See ante* at at 451–52 (describing the Florida override process and its constitutionality).

The balancing and override mechanisms are important in determining whether the sentencing body actually imposes the death penalty where the defendant has been found guilty of a crime which makes the defendant eligible for such a sentence. Likewise, the *Caldwell* error in *Dugger v. Adams* and the Fifth Amendment violation in *Smith v. Murray* were crucial to the sentencing body's decision to impose the death penalty in those cases. An error in applying these safeguards can provide a basis for relief if the error is timely asserted. However, when the focus narrows to whether the petitioner has demonstrated his potential "actual innocence of the death penalty," these errors do not suffice to overcome the jurisdictional bar that their default imposes.

termine whether the petitioner has made a colorable showing of "actual innocence" of the death penalty, as Johnson has failed to do so in this case. A "fundamental miscarriage of justice" arises only when the sentencing body exercises its otherwise unreviewable discretion to impose the death penalty on a person who committed no crime for which the state could sentence him to death.

Because the majority has decided this case in conflict with that fundamental principle of habeas jurisdiction, I respectfully dissent.

As the majority stated in disposing of the original *Tedder* issue in this case,

> "federal court review does not encompass an inquiry as to whether the trial judge's decision to override the jury's recommendation of life imprisonment is consistent with the state law standards established in *Tedder* and its progeny.... The answer to that question is solely an issue of state law and it is not within our province to second-guess that result.... Instead, our review ... is limited to whether the imposition of the death penalty in that given case is either arbitrary or discriminatory.

*Ante* at 452.

It follows that our only inquiry with regard to the possible interplay between Johnson's ineffective assistance of counsel claim and Florida's standards for a jury override is whether the Florida Supreme Court's refusal to reach the merits of Johnson's claim will result in an arbitrary imposition of the death penalty. See the cases cited *ante* at 452. The facts persuade me that the imposition of the death penalty is not arbitrary and capricious in light of Johnson's

claim. Johnson was eligible for the death penalty by having committed first-degree murder accompanied by four statutory aggravating circumstances: his crime was "an atrocious and cruel execution murder committed during the commission of an armed robbery by an escaped convict who previously had been convicted of felonies involving the use or threat of violence," *Johnson v. State,* 393 So.2d 1069, 1074 (Fla. 1980). Moreover, the newly-proffered evidence offered in mitigation is speculative and it may have little relevance to Johnson's decision to return to the interior of the store and execute his victim. The record simply does not suggest that this is an "extraordinary case" in which an alleged error has resulted in a "fundamental miscarriage of justice." *Dugger v. Adams,* 489 U.S. at ——, 109 S.Ct. at 1218 n. 6. The *Dugger v. Adams* Court in fact held that even where "the trial judge ... found an *equal number* of aggravating and mitigating circumstances[,]" an alleged *Caldwell* error did not result in a fundamental miscarriage of justice. *Id.* (emphasis added).